Plaintiff's Name  George N. Allen

Inmate No.  CO-000195-8

Address  Coalinga State Hospital, P.O. Box 5003

Coalinga, CA   93210

**FILED**

JAN 0 5 2009

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY _____
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF CALIFORNIA

| George N. Allen | 1:06-cv-01801-AWI-GSA (PC) |
|---|---|
| (Name of Plaintiff) | (Case Number) |

vs.

AMENDED COMPLAINT

Stephen Mayberg, Ben McClain, Pam Ahlin, Gary

Renzaglia, Linda Clark, Rocky Spurgeon,

Civil Rights Act, 42 U.S.C. §1983

Chuck Rabault, Eddie Sanchez, Tom Hunt

Tom Voss, Norm Kramer

(Names of all Defendants)

I.   **Previous Lawsuits (list all other previous or pending lawsuits on back of this form):**

A.   Have you brought any other lawsuits while a prisoner? Yes**XX** No____

**RECEIVED**

B.   If your answer to A is yes, how many? ____one____
Describe previous or pending lawsuits in the space below.
(If more than one, use back of paper to continue outlining all lawsuits.)

JAN 0.5 2009

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY _____
DEPUTY CLERK

1.   Parties to previous lawsuit:

Plaintiff_____George N. Allen, et. al.

Defendants____Stephen Mayberg, Ben McClain, Pam Ahlin, Gary  Renzaglia, Linda Clark

Rocky Spurgeon, Chuck Rabault, Eddie Sanchez, Tom Hunt, John Doe

*Tom voss, Norm* 1-99, et. Al.,
*Kramer*

2.   Court (if Federal Court, give name of District; if State Court, give name of County)
Fresno County Superior Court, State of California

3. Docket Number____07CRWR678246_____  4.Assigned Judge____Gary D. Hoff_____

5.   Disposition (For example: Was the case dismissed? Was it appealed? Is it still pending?)
Dismissed for failure to exhaust administrative remedy, state law.

6. Filing date (approx.)__03-05-2007_____   7. Disposition date (approx.)__04/2007__

II. **Exhaustion of Administrative Remedies**

    **A.**    Is there an inmate appeal or administrative remedy process available at your institution?

        Yes <u>XX</u>  No_____     There is available a Patient Right's Advocacy.

    **B.**    Have you filed an appeal or grievance concerning **ALL** of the facts contained in this complaint?

        Yes <u>XX</u>  No_____

        If your answer is no, explain why not_____  THERE IS NO PROCESS WHEREIN PLAINTIFF _____

            CAN FILE AN APPEAL UP TO THE DIRECTOR OF MENTAL HEALTH.

            THERE IS A PROCEDURE WHICH A PATAIENT CAN FILE WITH THE  PATIENT'S

            RIGHTS ADVOCATE.

    **C.**    Is the process completed?

        Yes <u>XX</u>        If your answer is yes, briefly explain what happened at each level.

                    SAME AS ITEM (B) ABOVE

            PATIENT RIGHTS ADVOCATE PROCESS IS SLOW TAKING ANYWHERE

            FROM  6 MONTHS TO TWO (2) YEARS.

        No_____        If your answer is no, explain why not.

**NOTICE:**    Pursuant to the Prison Litigation Reform Act of 1995, "[n]o action shall be brought with respect to prison conditions under [42 U.S.C. § 1983], or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a).  If there is an inmate appeal or administrative remedy process available at your institution, you may not file an action under Section 1983, or any other federal law, until you have first completed (exhausted) the process available at your institution.   You are required to complete (exhaust) the inmate appeal or administrative remedy process before filing suit, regardless of the relief offered by the process. Booth v. Churner, 532 U.S. 731, 741 (2001); McKinney v. Carey, 311 F.3d 1198, 1999 (9th Cir. 2002). **Even if you are seeking only money damages and the inmate appeal or administrative remedy process does not provide money, you must exhaust the process before filing suit.** Booth, 532 U.S. at 734.

III. **Defendants**

    (In Item A below, place the full name of the defendant in the first blank, his/her official position in the Second blank and his/her place of employment in the third blank.  Use item B for the names, positions and places of employment of any additional defendants.)

    **A.**    Defendant <u>STEPHEN MAYBERG</u>  is employed as <u>DIRECTOR OF CALIFORNIA</u>
        <u>Dept. of Mental Health</u> at  <u>1600 9th Street, Sacramento, CA.  95814</u>

B.  Additional defendants  Pam Ahlin, Executive Director (A), Coalinga State Hospital, Tom Voss, Executive Director, Coalinga State Hospital, Ben McClain, Executive Director (A), Coalinga State Hospital, Norm Kramer, Executive Director (A), Coalinga State Hospital, Gary Renzaglia, Clinical Administrator, Coalinga State Hospital, Eddie Sanchez, Police Chief, Coalinga State Hospital, Chuck Rabault, Police Chief, Coalinga State Hospital, Tom Hunt, External Affairs Administrator, Coalinga State Hospital, Rocky Spurgeon, Program Director, Coalinga State Hospital, Linda Clark, Asst. CPS Movie Chairperson, all are located at Coalinga State Hospital, P.O. Box 5000, Coalinga, California, 93210

IV.   **Statement of Claim**

(State here as briefly as possible the facts of your case.  Describe how each defendant is involved, including dates and places.  Do not give any legal arguments or cite any cases or statutes.  Attached extra sheets if necessary.)

SEE ATTACHED SHEETS

V.  **Relief.**

(State briefly exactly what you want the court to do for you.  Make no legal arguments.  Cite no cases or statutes.)

SEE ATTACHED SHEETS

I declare under penalty of perjury that the foregoing is true and correct.

Date _12/27/08_                    Signature of Plaintiff _____

(revised 2/10/2006)

3

George N. Allen, CO-000195-8
Coalinga State Hospital
P.O. Box 5003
Coalinga, CA   93210

**IN PRO PER**

# UNITED STATES DISTRICT COURT

## EASTERN DISTRTICT OF CALIFORNIA

| | | |
|---|---|---|
| George N. Allen, | ) | CASE NO. 1:06-CV-01801-AWI-GSA |
| Plaintiff, | ) | |
| v. | ) | AMENDED COMPLAINT |
| Stephen Mayberry, W. T. Voss, | ) | Civil Rights Act, 42 U.S.C. § 1983 |
| Pam Ahlin, Gary Renzaglia, | ) | |
| Rocky Spurgeon, Eddie | ) | |
| Sanchez,Chuck Rabault, Linda | ) | |
| Clark, Tom Hunt, John Doe | ) | |
| 1-99, et. al. | ) | |
| Defendants. | ) | |

TO:   THE HONORABLE GARY S. AUSTIN, MAGISTRATE, UNITED STATES DISTRICT COURT, EASTERN DISTRICT OF CALIFORNIA.  Comes now George N. Allen, plaintiff in whose behalf this petition for an Amended 42 U.S.C. §1983 is applied for.  Plaintiff is confined from liberty at Coalinga State Hospital, located at P. O. Box 5003, Coalinga, California, in the custody of Pam Ahlin, Executive Director (A), as a result of a probable cause hearing pending a civil commitment ·trial under California's Welfare & Institution Code, Section 6600.  Plaintiff is not challenging the order ordering their detainment.

## OPENING STATEMENT

Plaintiff brings before this court violations of his constitutional rights guaranteed by State and Federal Regulations, State and Federal Court Citations, the Constitution of California, and the Constitution, Laws, and Treaties of the United States of America. The California Department of Mental Health, herein known as (DMH), Coalinga State Hospital, (CSH), Department of Public Safety, (DPS Police Officers), and its employees, under color of law has conspired to violate and deprive Plaintiff of his rights protected by Constitution the United States of America. 1). Freedom

4

of Speech and Expression, First Amendment U.S.C.A.  2). Freedom to be secure in personal effects and property, and search and seizure of property without cause, Fourth Amendment; 3). Due Process violations of State and Federal law as well as violations of plaintiff's Equal Right Protection under the law; protection of property interest, and liberty right to be free from illegal searches without cause, Fourteenth Amendment U.S.C.A.

## STATEMENT OF FACTS

1).  When CSH opened in 2005, there was not enough qualified licensed Health Care Professionals to effectively provide the minimum amount of treatment care needed at Coalinga State hospital.  Therefore, DMH, under Stephen Mayberg, DMH's Director, sought and was granted a six (6) year waiver, exempting CSH from providing full licensed mental health care treatment to Sexually Violent Predators (SVPs), under the state's Sexually Violent Predators Act. CSH became the only California State Mental Hospital to lower the Mental Health Care Standards to SVPS **only**.  Plaintiff has been held for five (5) years awaiting a commitment trial by a state court to determine whether or not plaintiff is an SVP and in need of therapeutic mental health care treatment for his sexual deviant behavior.  Instead plaintiff has found he is once again confined in a restrictive and punitive environment not conducive to therapeutic treatment.  This has thus led to violations of the Fourteenth Amendment, Equal Protection and its protective liberty interests under the laws of the United States Constitution of America (U.S.C.A.).  Tom Voss, executive Director, CSH, as well as the current Hospital Executive Director Pam Ahlin, Eddie Sanchez, Head of Hospital Investigation and acting Police Chief, Chuck Rabault, CSH Chief of Police, Gary Renzaglia, Clinical Director, and Rocky Spurgeon, Program Director, (known as the Hospital Executive Committee responsible for implementing hospital policy), have implemented policies of giving hospital police officers control over patients who are committed civilly.   Plaintiff was committed to the California Department of Mental Health, and not the California Department of Public Safety (DPS), which is a police agency which enforces all laws and regulations within the State of California.  Police Officers are responsible for catching, and punishing all individuals who violate California Laws.  All patients including plaintiff, is committed for therapeutic treatment with Professional Health Care Providers, and are not to be placed in the custody of police officers as a condition of their commitment.  Therefore, Police Officers **SHOULD NOT** have a position of

5

authority over plaintiff and plaintiff's treatment plans. These officers are not licensed to be mental health care providers and to have police officers over the treatment of plaintiff is anti-therapeutic. By having police officers on treatment units, overseeing plaintiff and his everyday needs, the hospital has violated established Federal Treatment Regulations concerning civilly committed individuals. These police officers as of April 4, 2007, have now been armed with mace, batons, and electrical stunning devices on the treatment units against Federal Treatment Standards on licensed treatment units within a mental health facility. Instead of a therapeutic treatment environment, plaintiff and the SVP population now looks upon these actions as confrontational and intimidating, which are directed at the SVP population as a whole. This is the **only California State Mental Hospital** where armed police officers are in control over plaintiff instead of Mental Health Care Professionals. This is a violation of the Equal Protection Clause of the United States Constitution, Fourteenth Amendment. Plaintiff has already completed his punishment phase by serving his time within California Department of Corrections & Rehabilitation. SVPS at Atascadero and the only female SVP at Patton State Hospital are under the authority and care of Professional Health Care Providers, with police officers being barred from the treatment unit unless there is an alarm or the officers are making their security rounds. Police officers at other California State Hospitals do not oversee the treatment of patients.

A). **Police officers are now embolden to disregard plaintiff constitutional rights and have instituted a restrictive confinement.**

Police officers are now opening patients incoming and outgoing mail, searching dorm refrigerators, seizing and destroying patient personal property and food items, searching patients rooms and lockers at least once a week without **probable, reasonable, special needs, or good causes**. The police and hospital administrators under Chuck Rabault, and Pam Ahlin with the approval of Stephen Mayberg, have directed their subordinates to also institute a hospital policy which allows police officers to search patients who leave for the courtyard in order to smoke or just talk without **probable, reasonable, special needs, or good causes.** These policies are entirely the same type of control policies State Correctional Officers have at State Prisons under a punitive restrictive system of incarceration. There are no justifiable reasonable reasons why

6

plaintiff and plaintiff property should be searched every week to satisfy a hospital weekly search quota. Plaintiff has been committed to DMH since October 2003, and every week since that time, DMH staff has made intrusive searches of plaintiff property. This amount to a total of 260 searches; not including hospital wide searches of plaintiff's property without **any** contraband or illegal items being found. These searches violate plaintiff liberty interest to be free from intrusive searches by government agencies without due process. The police have now been emboldened by Administrators to help establish policy in regards to how patients are to be treated. (**See exhibit "A" wherein police have written treatment policy which can only be written by Health Care Professionals**) Plaintiff found on his dorm door a memo from the Treatment Unit Police Officers that if the dorm vents were blocked, or the lights covered, and the door latches were stuffed, that the entire dorm would be searched and the patients' assigned to that dorm may have their PAS levels placed on hold according to Administrative Directive (A.D.) #626. A PAS level allows patients' to go to the yard, canteen, library, classes, etc. Without this PAS level, patients' are restricted to the treatment unit. Only Health Care Professionals are allowed to withhold PAS levels to evaluate whether or not a patient is a threat to himself or others. This is a treatment procedure, and is not to be used in a punitive way. The police officers on the treatment unit use the threat of PAS level reductions or the threat of searching the patients' rooms as a punitive measure to exercise control over the patients'. This has created an atmosphere of fear with plaintiff and other patients' within a dorm. This fear is brought on by the fact that police officers want plaintiff or other patients' within the dorm to tell the police who are responsible for stuffing the door latches, covering the night lights, or blocking the air conditioning/heating vents when its either to cold or hot. This is anti-therapeutic because it has cause animosity among the patients within the dorm setting. This is setting a dangerous president to the physical safety of plaintiff and weaker patients within a dorm from harm from other patients on the treatment unit who may think that a certain patient reported the guilty patient to the police. The treatment unit is a fifty (50) men unit having four (4) men dorms and it has been the hospital policy to try to get other patients' to check or control the patient who is violating the rules of the hospital by threatening the whole patient population with restrictive punitive measures. This has cause a potential physical and harmful situation for plaintiff and the patient population. If plaintiff or any

other patient within the dorm refuses to tell the officers who is responsible for any rule infraction, plaintiff and the other patients within the dorm is subject to an intrusive search of their personal property without cause.   Federal courts have stated that security personal have no rights to decide therapeutic treatment plans of the hospital's patients.  All therapeutic treatment is to be established by those professionals who have degrees in health care treatment, i.e., Nurses, Psychologist, Psychiatrist, Psych Tech, etc. Therapeutic treatment has been replaced with punitive restrictions which equal that of State Prisons.  By lowering the minimum therapeutic treatment standards, Stephen Mayberg, Director of DMH have created conflicts between the DPS Police Officers who are on treatment units, and Mental Health Care Professionals at CSH, these two (2) state agencies are now fighting over who has the final say over the patients' treatment plan.   This infighting between police and treatment staff has resulted in placing plaintiff and patients between these warring factions, which is anti-therapeutic and has resulted in confusion over the rights that plaintiff have; and if that right can be violated and restricted by police and administrators under color of authority without court intervention.   The actions by Stephen Mayberg, Director DMH, Pam Ahlin and other past Executive Directors including Tom Voss has led to the restrictions plaintiff is now experiencing on the treatment unit.  These actions by Stephen Mayberg, Director DMH and Pam Ahlin Executive Director of CSH are violations of the Fourth and Fourteenth Amendment U.S.C.A.  Freedom against search and seizures; freedom against unreasonable searches; and freedom to be protected against harm by either staff or other patients.

### B. ILLEGAL SEARCH AND SEIZURE BY HOSPITAL POLICE
### VIOLATES THE FOURTH AMENDMENT U.S. CONST.

On Thursday, 01/18/07, at approximately 0600 hours, police officers on treatment unit five (5) became suspicious of a patient in a four (4) men dorm.  This patient was suspected of having super glue in his possession.  The officers conducted a search of the four men dorm, finding the super glue and a three (3) inch screwdriver used to open small radios, etc.  The police locked down unit five, and received permission from Rocky Spurgeon, Program Administrator, and Chuck Rabault, Chief of Police, to search the entire unit.  The police literally destroyed

8

patients' property doing the search. There was no justification for this search once the items in question were found. After the items were found, police officers received permission from Rocky Spurgeon, Program Administrator to pick-up all patients' computers, computer disc, and CD players, DVD Players including plaintiff's if these electronic devices had a rewritable disc in them. This was based upon Administrators suspicion that maybe someone had pornographic movies on their computers or the CD rewritable's. No one was singled out as being in violation of having pornographic movies, it was Rocky Spurgeon's means of denying plaintiff of his property without reasonable, probable or just cause, violating plaintiff's Fourth and Fourteenth Amendments of the U. S. Const. to be secure with plaintiff's property against illegal search and seizures, as well as due process violations of both amendments. The police proceeded to confiscate everyone's laptop computers and CD rewritable discs without just or probable causes. This group disciplinary action by the hospital administrators amounted to a due process violation of plaintiff's privacy rights who was not involved in the original search of the four (4) men dorm. The hospital's policy has always been that if one patient is found in violation of a hospital's rule, the entire patient population is punished. Plaintiff Allen had his room searched and four (4) CD rewritable's were confiscated, these rewritable's have not been returned to plaintiff as of this writing. **(See exhibit "B")** These CD rewritable's are sold in the patients' canteen for $1.50 each, and only had music on them. When plaintiff's CD's were confiscated, the officers labeled them as altered. Plaintiff asked Lt. Rogers what was meant by altered, and the lieutenant replied it means that there was something on the CD and that administrators' had to look at the CDs' to determine if there was anything illegal on the CDs. Lt. Rogers, DPS Police Lieutenant, Jim Robinson, Nurse Coordinator, Barbara Devine, Unit Supervisor, and Sgt. Walker, DPS Police informed plaintiff on January 28, 2007, that if there was music on plaintiff CD rewritable's, the CDs' would be returned to plaintiff. This has not happened. The hospital had no legal authority to take Plaintiff property without just or probable cause under a supposedly suspicion that someone maybe had a

pornographic DVD Disc. This action by the hospital administration amounts to a violation of the Fourth and Fifth Amendment of the U.S.C.A.

> **II. Hospital Administrators, Tom Voss past Executive Director Pam Ahlin, Current Executive Director, Linda Clark, Asst. CPS Gary Renzaglia, Clinical Administrator, have adopted policies of censoring DVD Movies that plaintiff have purchase for his private entertainment. This amounts to a First Amendment violation of the Constitution of the United States of America.**

On April 15, 2006, the hospital administration along with the Patients Advisory Council agreed that since the hospital would not purchase cable television for the patients' population, which they had at Atascadero State Hospital, the patients would be allowed to purchase for their own personal and private use DVD Players, and DVD Movies. It was decided by the Patients Advisory Council with a meeting with W. T. Voss, Executive Director of Coalinga State Hospital (CSH), stated that patients along with hospital administrators would set a reasonable standard for ordering DVD movies. The standards agreed upon were as follows:

1. No DVD movies with explicit rape scenes or extended nudity.

2. No DVD movies showing explicit abuse of women and children.

3. No DVD movies consisting of bondage and S&M.

4. All DVD movies rated "PG-13" and below would automatically be allowed to be purchased.

5. All "R" rated movies to be review by the Movie Committee to make certain that items 1, 2, and 3 were not incorporated in any DVD movies.

Plaintiff, who was a member of the Patients Advisory Council, and Chairman of Unit Five, representing approximately 40-45 patients explained the tentative agreement to those he (plaintiff) represented. A vote was taken, and it was agreed upon by the patients to accept the tentative policy as stated, giving up a limited amount of their First Amendment rights based upon the above agreement in regards to DVD movies. As this court will see later on with the exhibits, DMH **does not censor** its patients the right to own media or music information for their own **private entertainment.**

On May 15, 2006, the Coalinga Hospital Movie Committee, (CHMC), consisting of state

employees, came out with a movie policy inconsistent with the agreed upon policy set forth by W.T. Voss, Executive Director, and the Patients Advisory Council. A tentative hospital policy was written, and was approved by W. T. Voss approximately one week later which states:

1. Children shall not be the main character of a movie.

2. No explicit sexual content, e.g., rape, nudity, bondage, intercourse

3. No "R" rated movies with explicit violence towards women or children. "R" rated movies will be judged upon the content individually.

4. No "X" rated or non-rated movies. Non rated movies will be considered on a case by case basis.

5. All movies should generally be of a positive nature.

6. The Movie Committee will utilize the kids-in mind.com movie Review scale of 1-10 for three areas: Sex and Nudity, violence And gore, and profanity in making their decisions for an allowable movie. A score of "7" or higher would be considered unacceptable."

Procedure #6 above gave the hospital movie committee carte Blanche authority to censor and deny any patient the right to purchase any movies with profanity, violence and gore. Procedure #1, gave the hospital the authority to deny **ALL** movies with children, adolescents, or teenagers as main or secondary characters. Movies like *"Bad News Bears"*, or *"Miracle 34th Street"*, are movies which was denied for purchase by plaintiff. The hospital then proceeded to print up DVD movie approval forms, which have to be submitted to the CHMC for approval/denial of movies. On June 16, 2006, Gary Renzaglia, Hospital Clinical Administrator, and Linda Clark, CPS, Coalinga Hospital Movie Committee (CHMC) Chairperson, appeared before plaintiff and the Patients Advisory Committee to explain the new procedure for ordering movies. Mrs. Clark stated that the new policy was based upon the hospital's Administrative Directive, known herein as the (A.D.), which deals with hospital policies. She explained that A.D. #242 would be the controlling (A.D.) for personal DVD movies. It was explained to Mrs. Clark that A.D. #242 deals with hospital movies shown on hospital state own television sets which are located in patients' dayrooms. Plaintiff and other council members stated that the policy which controls the **private ownership** of any books, or magazines, A.D #818, should in fact be the controlling (A.D.), along with the agreed upon policy between the Patients' Advisory Committee and the Administrators. The key

to this entire writ is for the **Private Viewing** of any DVD movies, which is an expression of free speech under the First Amendment of the U.S.C.A. Plaintiff does not, and is not challenging the policy of what movies the institution may show on its own state controlled television sets, but is challenging the hospital policy of trying to regulate what plaintiff may or may not view on his own private personal DVD player in the privacy of his dorm. Plaintiff explained to Mrs. Clark, that if plaintiff checked out a book from the hospital library, or own books like Anne Rice's "*Diary of A Vampire*", or any other descriptive books dealing with violence and gore, sexuality, children, or any books like the *"Harry Potter"* book series, which patients are legally allowed to possess in book form; that those same books with the same content or expressions could not be purchased in a DVD movie which is based upon the book? The response was "YES"; all movies from "G" to "R" ratings can be denied based upon its **content**. These illegal procedures thus violate the First Amendment, U.S.C.A., Freedom of Speech, Freedom of Expression, and the Fourteenth Amendment, U.S.C.A., Equal Protection under the Law, and the Due Process Clause of the Constitution. **(See Patients' Rights Advocate response exhibit "C")**

On July 5, 2006, the hospital violated plaintiff's Allen constitutional rights by denying plaintiff the right to purchase the movies *"Full Metal Jacket"*, and *"Apocalypse Now-Redux"*. **(See exhibit "D" 'Patient Personal DVD Approval Request)** This amounted to a constitutional violation of plaintiff's due process rights guaranteed under the Fourth and Fourteenth Amendment of the U.S.C.A., as well as the First Amendment banning censorship based upon content of **any** movie. The movies were denied based upon the content of the movies, which the hospital stated, was its violence. All war movies depict violence and gore of some kind. Since the original filing of this writ in the court, the CHMC have been emboldened to increase the list of movies denied plaintiff on a list called "**Requested Movies – Denied**". This list includes a broad range of movies rated from "G" to "R", which are not allowed to be purchased by plaintiff or any other patients. Most of these movies have been viewed on public television, and throughout the prison system, including other facilities within DMH. Patients at Coalinga State Hospital are not allowed to have these movies based upon the content due to the **Kids-in-mind.com** movie ratings system that CHMC has adopted. The **kids-in-mind.com** rating system is what parents use to judge what their child should watch. Plaintiff is an adult, and cannot be censored as to what adult movies

plaintiff is allowed to watch based upon the **kids-in-mind.com** ratings. What is explicit for a child to watch is not explicit for an adult. Plaintiff is not a child and Coalinga State Hospital has not been given the right to censor plaintiff' movies as a parent. Sexually Violent Predators (SVPS) at Atascadero State Hospital and elsewhere throughout the country **are allowed to watch these movies without censorship.** Some movies have been denied based upon its ratings, but if the ratings are 6 and below, they should be approved according to the hospital's own movie policy. Some have been denied based upon the content, even though the ratings are 6 and below. What is meant by content? Movies like *"The Art Of War"*, no ratings: *"Dead Man Walking"* with a rating of 3-6-6; *"Big Fat Liar"*, 2-3-3; *"Cellular"*, 3-6-5; *"Hulk"*, 2-6-4; and many more have been denied without any rational reasons as to why the movies were being denied.

The Department of Mental Health have given patients' the **RIGHT** to own for their own private reading, any 'sexually explicit pornographic material', within DMH, as can be seen by **(A.D. #818, Class 5 Controlled Items)**, Which states:

> "A method of control needs to be exerted on the items listed in this category so that they can be accounted for when necessary. The person issuing the item will be responsible for ensuring that a method for control

> 1. *"Sexually explicit or pornographic material shall not be displayed in a way that is offensive to others."*

This is a statewide policy within the Department of Mental Health. DMH does not censor its patients from any media publication. Therefore, any sexually explicit pornographic magazines, **Playboy, Hustler, etc.,** as well as books and music, are allowed to be in the possession of SVP patients for their private use. This amounts to a Fourteenth Amendment violation under the Equal Right Protection Clause concerning the censorship of plaintiff purchasing for his own private use DVD movies.

> **III. CSH Administrators have adopted a policy of opening all of plaintiff's incoming and outgoing mail without cause which is contrary to court orders guaranteeing the rights of all civilly committed patients to receive sealed incoming mail, and send sealed outgoing mail.**

**Fourteenth Amendment U.S.C.A. Liberty rights to**
**possess personal property without intrusions from**
**State agencies.**

On December 11, 2006, W. T. Voss, Coalinga State Hospital, which is under the authority of Stephen Mayberg DMH, and with Stephen Mayberg consent decided to implement its Administrative Directive, herein known as (A.D.), which deals with patients mail.   Prior to implementation of the policy, on Friday, December 8, 2006, at approximately eleven (11:00) o'clock AM, Barbara Devine, Unit Supervisor, held a meeting with the patients on Unit 5, and explained that A.D. #622 would become active on December 11, 2006. It was explained to Mrs. Devine that the hospital policy was illegal concerning civil patients under both State and Federal Regulations, including Federal Court citations and opinions.  Mrs. Devine said that this may be true, but she was only enforcing what her superiors told her to do.  On December 18, 2006, plaintiff Allen received from the Los Angeles Public Defender's Office a letter which the Department of Public Safety (DPS) Police Officer seized and opened without just cause, or plaintiff's permission to do, plaintiff's legal mail.  Officer Tarkington, under the direction of his immediate supervisor Lt. Rogers proceeded to open plaintiff mail everyday while assigned on Unit 5.   After Officer Tarkington was reassigned, other officers assigned to Unit 5 continued the practice of opening and inspecting plaintiff incoming and outgoing mail.  The police officers were enforcing A.D. #622, which their immediate superiors, Eddie Sanchez and Chuck Rabault ordered them to do, with the blessings of Stephen Mayberg, Director DMH.  Plaintiff and other patients within DMH have a ***right*** to privacy.  This privacy right extends to all civilly committed patients' involuntarily committed to State Hospitals to receive and send sealed mail without that privacy being invaded or censored by state officials.  Plaintiff incoming and outgoing mail has since December 11, 2006 been opened by hospital police and inspected prior to being given to plaintiff. These privacy rights cannot be suppressed unless there are reasonable causes to do so, and only against the patient who has violated his mail rights.  These rights have been upheld in both State and Federal Courts in regards to the Civil Commitment Scheme. This was/is a violation of plaintiff's Allen's First and Fourteenth Amendment Rights under the Const. of the United States. Freedom from intrusive searches by police officers without Due Process, censorship of mail, and

violation of plaintiff's right to be secured with plaintiff's property.

**IV. Tom Voss, Gary Renzaglia, Rocky Spurgeon, and Tom Hunt adopted a policy of denying all visits with minors under the age of eighteen (18) years old. This amounts to a liberty interest of association, due process violations, and equal protection under the law. Fourteenth Amend. U.S. Const.**

CSH has also adopted a policy in 2006, which allows them to refuse visitations to patients from wives and family members, who may bring their minor children with them. Tom Voss was the Executive Director at the time this policy was established which has been continued by the present Executive Director Pam Ahlin and her subordinates. Tom Hunt, the External Affairs Administrator have been instructed to institute this policy hospital-wide. This policy is restrictive as it is anti-therapeutic and breaks up family relationships. (**See exhibit "E", letter addressed to Ms. Marquez)** This policy is causing many patients to go without visitation and support from friends and family because baby-sitters cannot be found. There are no justifiable reasons why children should be banned from visiting with family members unless the family member was a victim, or there is a court order preventing contact. This is a due process right violation of the Fourteenth Amend. U.S. Const.

Plaintiff have a right to receive visitation from family members including minor **children, as part** of his therapeutic treatment plan unless the minor child was the victim, or a court order is in effect against such visitation. There are no justifiable reasons why any of plaintiff's children or nephews and nieces should be prevented from visiting with plaintiff if they are accompanied by their legal guardian. If DMH has directed all Mental Health Care Professional responsible for a plaintiff's treatment plan deems it necessary to prevent such contact with a minor, it should be noted, based upon the plaintiff's history, stating the reasons why, and reviewed every thirty (30) days if the restrictions are to continue. This policy has kept plaintiff from having visits with family members. Plaintiff's family lives approximately two hundred (200) plus miles away from the state hospital, and to travel that distance only to have the visit refused is a violation of plaintiff's Liberty rights of association, and plaintiff right to equal protection/treatment under the First and Fourteenth Amendments U.S. Const. Plaintiff has informed his family members that because of the hospital policy, it would be unreasonable for them to visit him at this time unless the policy is

changed.   The hospital policy of refusing visitation of anyone under the age of 18 is unconstitutional.   Once again this is a restrictive punishment of the population as a whole based upon those SVPS classified as 'child molesters'. CSH visiting policy has effectively prevented family members from supporting love ones committed to state mental facilities because they were unable to visit unless they brought their children with them.   This is totally contrary to therapeutic treatment when patients' crimes are not against children.   There are many classes of SVPS committed for treatment under the SVP Act.   Child molestation is just one of them.   Not all SVPS are child molesters thus; the hospital is in violation of the Fourteenth Amendment, under the due process, equal protection and cruel and unusual punishment clauses of the United States Constitution.   Once again the pattern is that CSH will punish the whole patient population based upon those SVPS who crimes are against children, instead of formulating a treatment restriction based upon individual patients whose crimes are against a child.   This policy is unreasonable because it violates the equal protection clause of plaintiff while other civilly committed patients within State Facilities are allowed to visit with their minor children without restrictions.

> **V. Tom Voss, Gary Renzaglia and Rocky Spurgeon as**
> **well as Chuck Rabault have adopted a restrictive policy**
> **disallowing plaintiff to have those personal items he**
> **had while in State Prison, by placing restrictions equal**
> **to or more restrictive than State Prisons.**

CSH continues to violate the civil commitment scheme and the right to have the 'lease restrictive conditions' needed to achieve the purpose of the commitment.   This is not happening within CSH.   While in prison, plaintiff was allowed to have in his possession, television, radios, shavers, typewriters, eating utensils, hair clippers, hot pots, hot water stingers, headphones with cords of 6 to 8 feet, table lamps, fans, tweezers, scissors, sewing kits, regular pens and pencils, rulers, art supplies, musical instruments, regular toothbrushes, food items and can goods bought from the canteen store, etc.   These items are allowed within the Washington State SVP Commitment scheme.   (**See exhibit "F", Washington State 'Resident Property and Purchases Policy)**   At CSH, these items cannot be possess by plaintiff due to 'safety and security' of the institution.   Plaintiff is also not allowed to have his own personal clothes which are allowed at every other State that has either an SVP, or Sexually Dangerous Person (SDP) act. A

16

lot of these items are for personal grooming which amounts to a denial by DMH/CSH to allow plaintiff to possess even a regular toothbrush. Plaintiff' contentions are this: If these items were legal to possess within a high security punitive prison facility, how is it a 'safety and security' issue within a civil commitment scheme which is designed to be 'less restrictive' than a prison setting? Sexually Violent Predators, Sexually Violent Persons, and Sexually Dangerous Persons within other states which have civil commitment schemes, are allowed to possess these items for their use and comfort while being detained for therapeutic treatment. This is an Equal Right Protection violation under the Fourteenth Amendment of the U.S.C.A.

### VI. Plaintiff has a constitutional right to treatment while confined in a State Hospital. This treatment include the right of habilitation treatment which includes vocational and job training within the institution without discrimination. Fourteenth Amend. U.S. Const.

Every SVP   committed and those awaiting commitment under California's Welfare & Institution Code §6600, have served at least ten to twenty years and longer, within the California Department of Corrections & Rehabilitation system for their crimes.   During those years of incarceration, SVPs were treated no differently than other convicted criminals. In regards to work assignments, all prisoners had an *equal* opportunity to go to vocational training or seek work based upon a work list established when prisoners arrived at a facility. This list was based upon the order which prisoners arrived at a facility in determining who was placed in a vocation or job first. DMH/CSH has adopted a policy under the direction of Tom Voss, Executive Director and enforced by the new Executive Director Pam Ahlin, of trying to coerce patients into treatment by using a discriminatory practice of allowing patients who are involved in Phases, first choice of jobs or vocational training programs when they become available.   California SVP Law states patients cannot be coerce or forces into treatment by offering incentives to patients in certain treatment plans. This policy goes against forcing involuntary treatment upon those who feel they do not need phase treatment or insist they do not have a mental disorder; but would like to get into a vocational or job training program. Bruce, the job placement coordinator at CSH informed plaintiff in March of 2006 that patients who were in the phases only would receive priority in job placements. Plaintiff is involved in other forms of treatment that the hospital has available other

17

than the Phases. To deny plaintiff a job or a training program because plaintiff is not involved in Phases is punitive and coercive, and violates the equal protection clause of the 14th Amendment. Jobs and vocational training are a part of the patients' treatment plans, and should not be withheld because plaintiff refuses to enter the phases. As stated while Tom Voss was executive director of the hospital, all groups and classes taken by patients' are considered to be treatment as defined by the Federal Mall Program. Therefore, plaintiff who is involved in other forms of treatment must be afforded the same opportunities to vocational or job skills as those patients who are involved in Phases.

### VII. Hospital Public Address System (PA) is set to sound alarms in plaintiff's and other patients' sleeping area at all times of the day and night, disturbing plaintiff's sleep effectively damaging plaintiff hearing because of the noise level of the P.A. System is too loud and cannot be adjusted downward.

Plaintiff is also bringing up an issue which the hospital refuses to answer. The Public Address (PA) Systems is entirely too loud in plaintiff's dorm. The noise decibels are effectively damaging plaintiff and other patients' hearing. The PA systems has been use to awaken patients from sleep at early hours of the mornings, with false alarms and testing of the PA system. **(See exhibit "G" list of alarms and time)** The PA system has been brought to the attention of Tom Voss, Pam Ahlin, Gary Renzaglia, Rocky Spurgeon, Chuck Rabault, and Lt. Rogers, DPS Police Lieutenant that the PA system was disturbing plaintiff and other patients sleep throughout the early morning hours. The administrators mentioned above stated they were aware of the problems but no action has ever been taken to fix the PA system. There is anger over what patients see as a deliberate indifference attempt by CSH officials to provoke an incident. The PA system setup at Atascadero State Hospital sounded only in the halls and dayrooms on treatment units. By preventing the alarm systems from disturbing the patients in their sleeping quarters, Atascadero State Hospital patients rest was not disturbed. Plaintiff's complaints have been ignored by staff and police alike. What CSH has instituted amounts to a form of sleep depravation which has been banned as illegal even within the Geneva Convention as torture? This is a violation of the Fourteenth Amendment against

18

## CONCLUSION

In conclusion, Plaintiff reiterates that under the commitment scheme of the SVPA that plaintiff commitment is not to be restrictive or punitive but therapeutic in nature. Therefore, the hospitals adopted policies established by Tom Voss, executive Director, CSH, as well as the current Hospital Executive Director Pam Ahlin, Eddie Sanchez, Head of Hospital Investigation and acting Police Chief, Chuck Rabault, CSH Chief of Police, Gary Renzaglia, Clinical Director, and Rocky Spurgeon, Program Director, and supported by Stephen Mayberg, Director of California's Department of Mental Health; are policies which violate plaintiff's constitutional rights granted by State Health Care Regulations, Federal Health Care Regulations, and Laws established by Federal and State Courts as well as the Constitution of the United States. These adopted policies which the administration willingly know violates plaintiff's constitutional rights, are applied to SVPS **only**, and are restrictive and punitive in effect at CSH. These same types of adopted policies (mail, searches, property, wages, treatment of civilly committed patients, etc.) are not enforced anywhere else within California's Department of Mental Health. CSH administrators, supra, feel that SVPS are the worst of the worst, and deserves to be treated in a more restrictive manner than state prisoners. Defendants also feel that 'Safety and Security' of the institution gives them carte blanch rights to violate the plaintiff's constitutional rights. Plaintiff is either a mental patient's with all the rights that goes with being civilly committed for treatment of 'sexual urges' or plaintiff is still a prisoner confined for punitive reasons. The state of California cannot have it both ways. These constitutional violations of patients' civil rights, including a) Placing police officers over patients' health care are violations of Equal Protection Rights; b) Illegal searches and seizures by police officers of plaintiff's property; c) violations of plaintiff's rights to receive and mail outgoing sealed mail, and mail privacy rights; d) Cruel and unusual punishment, (PA System); e) visitation rights, Equal protection under the law.

## PLEADINGS

**WHEREFORE**, Good cause having been shown, the court should grant the U.S.C. § 1983 as

follows:

I.      Issue an order declaring Plaintiff constitutional rights;

II.     Issue an order for CSH to comply with Federal Case Law with Regards to Civilly Committed patients rights to receive and send sealed mail;

III.    Issue an order instructing CSH to comply with Federal Case Law with regards to civilly committed patients rights to receive visits with their minor children, unless the child was a victim, or there is a court order prohibiting such visits;

IV.     Issue an order barring CSH from continuing with random illegal searches of patients and

patients living quarters without just or probable cause.  The probable cause **must** be stated as to

why an individual or his living quarters is being searched;

V.      Issue an order barring CSH from searching an entire patient population based upon the actions of a few individuals;

VI.     Issue an order barring CSH from restricting plaintiff's rights in regards to DVD movies restrictions (censorship).  This orders does not include the right to purchase or have in plaintiff's custody any movie which is rated pornography with "X", "XX", or "XXX" ratings.

VII.    Issue an order barring Coalinga State Hospital from continuing with the policy of having Police Officers involved in patients treatment plans, or overseeing patients care on a treatment unit against treatment standards;

VIII.   Issue an order, ordering Coalinga State Hospital to follow the Federal and State Minimum Standards in regards to treatment of patients civilly committed to a mental hospital;

IX.     Issue an order stating that the hospital must abide by the 'least restrictive condition' by lifting the restrictions on plaintiff personal property which plaintiff had while incarcerated in a State Prison, and allow plaintiff to purchase property equal to that which is allowed at Washington State and their SVP Program. Ownership of property that does not present a threat to the safety and security of the institution is a right plaintiff have;

X.      Issue an order barring CSH Administrators from taking any reprisals against Plaintiff for filing this 42 USC 1983 Writ.

XI.     Issue an order granting Plaintiff injunctive and declaratory relief;

XII.    Issue an order in regards to the Public Address System (PA).  This system should be removed from plaintiff's sleeping area, or disconnected as there are Speakers outside of plaintiff's sleeping area in the hallways of the hospital which can alert employees of an emergency.

XIII.   That the court grant other and further relief that is just and proper.

## VERIFICATION

Plaintiff, in the above cause of action, having read the statement herein, and declare under penalty of perjury that upon information and belief, these statements are true and correct. Executed this 27th day of December, 2008, at Coalinga State Hospital, P.O. Box 5003, Coalinga, California 93210, pursuant to Federal Code of Civil Procedures, 28 USC §1746 and 28 USC §1621.

**Dated: 12/2708**                          **RESPECTFULLY SUBMITTED,**

George N. Allen
Plaintiff, Pro Se

# EXHIBIT 'A'

# Room 144

Today at 0830 hours I found this dorm room's door jammed.  I was instructed to give you a warning, but if this door is jammed again all individuals living in this room will have their level put on hold.

2-28-07

# Officer Tarkington

## ATTENTION RRU RESIDENTS

**Effective May 14, 2007:** All State Clothing that is left unattended in common areas after 1:00 am, will be removed from the area and placed in the laundry.

All personal property left in the common areas will be subject to search and removal.

If you wish to keep possession of your property or clothing, please take it with you to your room area when you retire for the evening.

We continue to have problems regarding "Blocked Vents," "Covered Lights," and "Stuffed Door Latches." The Program will be focusing on these issues, and the areas that are problematic. If your room area, or dorm currently utilizes 1 or more of the above implements, please be aware the entire area may be subject to search, and possible PAS Level Reduction for not complying with facility protocol.

Thank you for your cooperation.

Sergeant

Unit Supervisor

A.O. 626

(A)

# EXHIBIT 'B'

Coalinga State Hospital

## RECEIPT FOR CONFISCATED / DESTROYED PROPERTY

Date: 1·18·07                                        Unit # 5

| QUANTITY | ITEM / DESCRIPTION | DISPOSITION |
|---|---|---|
| 3 | SOY MILK — DISTRCHED | |
| 1 | AIT. HEAD PHONES | CAN |
| 4 | AIT CD'S — | |
| 2 | BREAD | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

You have the right to know that the property itemized above has been confiscated or destroyed to maintain compliance with Coalinga State Hospital security standards (Under the authority of Administrative Directives 818, 626 and 556). For specific details on process and procedures talk with your Unit staff.

Your signature does not imply agreement with the process, only notification of the removal of the above listed items.

Patient signature _____ AllEN _____

Employee Name CORONA / OXBORROW / TARKINGTON

Distribution:    White    Patient Chart - misc.
                 Yellow   DPS copy
                 Pink     Patient copy

---

RECEIPT FOR CONFISCATED/DESTROYED
PROPERTY

"CONFIDENTIAL PATIENT INFORMATION
CALIFORNIA WELFARE AND INSTITUTIONS CODE
SECTION 5328"

Coalinga State Hospital
CSH – Form # pending (New 12-14-05)

ADDRESSOGRAPH

# EXHIBIT 'C'

**PAI** Protection & Advocacy Inc.

**OFFICE OF PATIENTS' RIGHTS**
100 Howe Avenue, Suite 210N
Sacramento, CA 95825
Tel: (916) 575-1610
Fax: (916) 575-1613

Advancing the rights of Californians with disabilities                    www.pai-ca.org

# MEMORANDUM

TO: 

FROM:  Agnes Lintz
       Patients' Rights Specialist

RE:    Appeal of SR

DATE:  July 12, 2007

---

I am responding to your request for a Second Level Appeal of the above numbered patients' rights complaint regarding wanting approval for several different movies. This is an issue that the Patients' Rights Advocate at Coalinga has been working on for some time. Our office takes the position that CSH's criteria for the selection of movies appears to be excessively restrictive.

Tom Voss, in his appeal response wrote that "a movie request may be denied if staff believe its contents conflict with [the] mission ... to maintain a safe, secure and therapeutic environment for all patients." Our position is that there is a right to social interaction and to participate in recreational activities, unless they pose a tangible threat to safety and security. 9 CCR 884(4)(b)(10).

It appears that Coalinga State Hospital has modeled their policies regarding movies/videos approved for viewing on that found in 9 CCR 3220.4 (relating to inmates of state prisons). That regulation is explicitly authorized by Cal. Penal Code § 10006. There is no corresponding statutory authorization for the DMH to create similar policies. I have enclosed both of the above-cited regulations for your review.

PROVIDING PATIENTS' RIGHTS ADVOCACY AND INVESTIGATIVE SERVICES
THROUGH CONTRACT #04-74280 WITH THE
CALIFORNIA DEPARTMENT OF MENTAL HEALTH

(c)

# EXHIBIT 'D'

Department of Mental Health OFFICE                                    Coalinga State Hospital

2006 JUL 14  PM 2:24  Patient Personal DVD Approval Request

I, _George N. Allen_____, am requesting the following DVDs be approved
for my purchase:

approved 1. "The North & South : The Complete Collection" TV ministeries

denied 2. "Full Metal Jacket"  R
content

denied 3. "Apocalypse Now" - _Redux_  R
content

approved 4. "The Haunted Mansion"  PG

_Barbara Devine_ us                          6/30/06
Unit Supervisor or Psychologist                    Date

Your request is **Approved / Partially Approved / Denied:**

_Linda Clark_                                7/5/06
Linda Clark, AC, CPS                              Date
Movie Committee Chair

|  | THU 5  ALL Addressograph |
| **Patient Personal DVD Approval Request** | CO-CC0195-8  CA  02-28-50  H  MAR  BL  UNK  03-02-06 LA  WI 6602  09-04-03 |
| Confidential Client Information  See W & I Code Section 5328 |  |

CSH 090– (New 6/06)

# EXHIBIT 'E'

# ☆ Mental Health

Coalinga State Hospital
24511 West Jayne Avenue, Coalinga, CA 93210
(559) 935-4300

October 27, 2006

Cristina Marquez

Ms. Marquez,

It is the policy of Coalinga State Hospital that persons under the age of eighteen are not permitted to visit with patients.

Requests for an exception to the no minor visitation policy must be submitted in writing by the parent(s)/guardian(s) on a Minor Visitation Clearance Request Form (CSH-088).

Please complete the attached Minor Visitation Request Form and return it to:

Coalinga State Hospital
Attn: External Affairs Unit
P. O. Box 5000
Coalinga, CA 93210-5000

Your request will be reviewed by clinical, security, and administrative personnel, and you will be notified in writing when a decision has been made.

Coalinga State Hospital
External Affairs Unit

# EXHIBIT 'F'



Washington State
Department of Social
& Health Services

SCC Special Commitment Center

*POLICY 231*
*RESIDENT PROPERTY AND PURCHASES*

PAGE 1 of 3

| *Authorizing Source:* RCW 71.09 | *Effective Date*<br>December 23, 1997 |
|---|---|
| | *Re-issued*<br>April 17, 2006 |
| *Approving Authority:* $\quad$ 2006 | *Sunset Review*<br>April 17, 2008 |

## PURPOSE

This policy sets requirements for inventory, control, allowances, restrictions, and disposition of resident property to ensure accountability and to maintain a safe, sanitary, and orderly environment.

## SCOPE

This policy applies to general resident property and to religious items. See also policies 250, *Hobby Program;* 212, *Computers and Technical Devices;* and 205, *Access to Religious Ministry.*

## POLICY

I.  **Property Inventory and Disposition.**
Receiving and Distribution staff must inventory a resident's property when the resident is first admitted to the SCC, when the resident is transferred to another program area, when the resident is released from the total confinement facility, and at any time the assigned Program Area Manager, Residential Area Manager or Forensic Therapist Supervisor believes the resident's property is not accurately shown on the resident's authorized inventory of property.
   A.  The inventory must state if the property was kept by the resident or if it was stored in an SCC facility. If the property was stored, the inventory must say where the property was stored. If the property is not allowed, the inventory must show what was done with the property, including the reason and way the property was disposed of.

   B.  The staff person who does the inventory must sign it and date it. The resident must sign the inventory and if the resident refuses, the staff must note on the inventory that the resident refused. The person who completes the inventory must give the resident a copy of the inventory. The original must be kept in the resident's administrative file or, if kept electronically, in a file maintained by the manager of Receiving and Delivery services.

II.  **Liability for Loss or Damage.**
If a resident's property is lost or damaged, SCC employees are not liable, as long as they have been reasonably careful to safeguard the property.

III.  **Resident Responsibility.**
   A.  The resident is responsible for property released to him or her.

   B.  **Residents may not give away, barter, sell to, loan or trade their property with another resident or a staff member.** If the resident does any of these things, staff will seize the item and will issue a behavior management report of the rule infraction.

(F)

IV.  **Allowable Property.**
Residents may have only certain kinds and amounts of personal property. If an item does not appear in one of the following lists of allowed property, it is **not allowed** without special permission. *(See item V, below, and Attachment C.)*

A.  General items are listed in *Attachment A* – the Master Property List.

B.  Allowable religious items are listed in Attachment B, the Religious Property Matrix.

C.  The Computers and Technical Devices list is attached to policy 212, which explains how computers, games, and other electronic items can be requested and approved or denied.

D.  The current store lists may be changed at any time by the Administrator for Facilities and Support Services or his/her designee.

E.  Each property list must be reviewed at least annually, with Resident Advocate input.

F.  SCC management may change property lists and store lists but a change of a list will not mean that this policy is changed.

V.  **Program Area Property Review Committees.**
A.  The resident must ask the appropriate Program Area Manager, in writing, for any property or amount of property different from what is written in any list of approved property (the Master Property List, Religious Property Matrix, or Computers and Technical Devices List) and for any in-house hobby items.

B.  At least once a month, a property review committee in each program area must, consider resident requests to purchase property. ·These committees will recommend to the PAM if they believe the PAM should approve the request or deny it.
  1.  The committee will normally be made up of a Residential Area Manager and a Forensic Therapist Supervisor, with others participating as needed.   A Resident Advocate may attend property committee meetings and give comment.  The Resident Advocates will be given two working days' notice of the meeting time and location.
  2.  The Chaplain must review requests for religious items and say whether the items are appropriate to the religious belief the resident claims.
  3.  Computers, electronic· games, and technical devices must be approved by the designated information technology manager.
  *Attachment C* has a complete flow chart of the request and decision process.

VI.  **Display, Clutter, Storage, and Spoilage.**
Property and store lists, and the Religious Property Matrix state the kind and amounts of property generally allowed to a resident.  **Considering security, safety, orderliness and sanitation, it is unreasonable to expect that any individual resident may have all allowable property.** .
A.  Policy 230, *Resident Room Standards* sets requirements about display, location, and storage of a resident's property to establish safe, sanitary, and clutter-free conditions.

B.  Program Area Managers and the Associate Superintendent for Care and Treatment may make and enforce rules about property to be sure that the SCC is secure, safe, healthy and clean.  Property rules normally apply to all living units, but some differences are allowed to fit individual living units.

C.  A resident who does not keep his/her room clean and uncluttered may be limited in the kinds and amounts of property he or she can have.  Any limitations must be documented

in the Individual Treatment Plan.

**VII. Vendors and Purchases.**

A. Except for property issued to a resident by the SCC, property allowed to the resident when he or she is admitted, and clothing and allowed photo recordings from a resident's family, *all items, including gifts, must be pre-approved, must be purchased from an authorized vendor, and must arrive at the SCC directly from the vendor. Residents should not assume that a request will be granted automatically for any previously approved item or vendor.*

B. The Associate Superintendent for Care and Treatment or designee will approve vendors but all approved vendors must:
   1. Operate a legitimate public business, licensed in the state in which they are located
   2. Not be owned or significantly controlled by a resident or former resident
   3. Accept payment in a way that works with business practices of the SCC
   4. Sell items or services that fits the treatment and security mission of the SCC
   5. Follow these business service practices
      • Allow credit returns for undamaged purchases within 30 days of receipt.
      • Provide notice in advance of any restocking fee for returned items.
      • Address credit returns only to the resident who made the purchase

C. The Associate Superintendent for Care and Treatment or designee may keep a list of approved vendors to make the approval process clear and simple. A vendor which does not continue to meet the criteria in item VII. B. may be removed from this list at any time.

E. Resident purchases from vendors must be:
   1. Within spending limits required for the resident's current level of privilege (policy 236)
   2. Approved by the PAM,
   3. Within the allowed number of packages the resident may have in the month the resident receives the package.

**VIII. What happens if a resident has property that is *not allowed*?**

A. If property comes to the resident or is in a resident's possession and it is *not allowed* but it is *not contraband,* the resident must request that staff destroy it or donate it to an approved charity through the Chaplain, or sent out of the SCC, with the resident paying for the cost of mailing.

B. *Staff must seize and process contraband property* according to policy 401, *Contraband.*

C. Abandoned or unclaimed property.
   1. If a resident's property is left at the SCC, the responsible Program Area Manager or designee must attempt to contact the resident, his or her nearest relative, or his or her guardian to find out what to do with the property.
   2. After sixty days, if there is no direction from the resident or the resident's legal representative, the appropriate Program Area Manager and the Associate Superintendent for Care and Treatment will decide what to do with the property.
   3. If a resident is held in another facility, the Associate Superintendent for Care and Treatment will decide what to do with the property.

D. Instructions about holding and disposition of a resident's funds and property after death are in policy 122, *Resident Death.*

□

Special Commitment Center Policy Manual
rev. April 1, 2006

# Property

### Store items

Approved Albertson's items and SCC store goods are allowed for all residents unless individually limited by Treatment Plan.

### Religious items

The Religious Property Matrix is listed separately and items are individually approved for each resident.

### Hobby and Recreation items

Policies 250 and 251 govern individual approval for hobby item use and purchase.


SCC property lists show what property residents generally may have.
Individual residents may be restricted from possession of certain property, and other residents, by individual request, may be allowed property which does not appear on a property list.

EXCEPT FOR SCC ISSUE AND PROPERTY ALLOWED AT ADMISSION, ALL ITEMS, INCLUDING GIFTS, MUST BE PRE-APPROVED, PURCHASED FROM AN AUTHORIZED VENDOR, AND ARRIVE AT THE SCC DIRECTLY FROM THE VENDOR.

Residents are expected to be reasonable in the amount of property they have in their rooms. Room standards require that residents not create clutter, allow spoilage, or make their living spaces unsafe.

PROPERTY LISTS MAY BE REVIEWED AND CHANGED AT ANY TIME, SUBJECT TO RESIDENT INPUT AND/OR PROGRAM NEED.

*Item    Quantity    Description*

| CLOTHING | | |
|---|---|---|
| Shirts | 10 | No green (or other staff uniform color) |
| Tee Shirts | 10 | No green (or other staff uniform color) |
| Pants (m/f), Skirts (f) | 10 | Jeans, slacks, suit pants, sweatpants and (females only) skirts |
| Jacket/Coat/Rainwear | 4 | Any combination (rain jacket/pants count as 1 item). |
| Jacket-Dress | 3 | "Sport" or suit jackets. |
| Sweatshirts Sweaters | 10 | No green (or other staff uniform color) |
| Suspenders | 2 | N/A |
| Belts | 2 | N/A |
| Ties | 3 | N/A |
| Shorts | 4 | Athletic/casual |
| Hats | 4 | No black (or other staff uniform color) |
| Head Bands | 5 | N/A |
| Pocket handkerchiefs | 6 | Plain color or white. |
| Pony Tail Holders | 2 pkgs | Package item. |
| Shoes, boots - pair | 5 | Sports, street. No steel toes or metal shanks. |
| Socks - pair | 14 | N/A |
| Shower "flip-flops" | 2 | N/A |
| "House" slippers | 1 | Pair. Soft material and sole. |
| Bathrobe | 2 | N/A |
| Undergarments (m/f) | 10 | For females, 10 underpants and 10 bras |
| Long Underwear | 5 | N/A |
| Pajamas | 5 | N/A |
| Laundry Bag | 2 | N/A |
| JEWELRY | | |
| Rings | 2 | Plain, flat band or cast figures/mountings with no sharp edges. |
| Earrings | 2 | Post type, no hooks. Maximum 1 inch length. |
| Pins | 3 | Post type, no "safety" pin fastener. Maximum 1 inch any dimension. |
| Bracelets | 3 | Leather/cloth/light metal or plastic |
| Anklets | 3 | Leather/cloth/light metal or plastic |
| Watches | 2 | Valued $150.00 or under. |
| Necklaces | 3 | Breakable. Beads OK. No sharps, stones. Attachments max 1". |
| LINEN | | |

All linen must meet flame retardant standards.

| | | |
|---|---|---|
| Pillows | 2 | No foam. |
| Pillow Cases | 4 | N/A |
| Sheets | 4 | Two fitted sets or four flats. |
| Blankets | 4 | N/A |
| Bedspreads | 2 | N/A |
| Mattress Cover | 1 | N/A |
| Bath Towels | 5 | N/A |
| Hand Towels | 5 | N/A |
| Wash Cloths | 5 | N/A |
| Beach Towel | 1 | N/A |
| MISCELLANEOUS ITEMS | | |
| Musical Instruments | 1 | With equipment. Value under $500.00. |
| Smoking Pipes | 2 | No metal parts. |
| Cigars | 24 | May be in light wooden or cardboard box. |
| Board Games | 3 | By approval. No sharps, no electronics; no sexually-oriented. |

## ROOM FURNISHINGS

Curtains, upholstery, bedding, and other materials must meet flame retardant standards.

| Item | Qty | Description |
|---|---|---|
| Chair | 1 | N/A |
| Waste Basket | 1 | Issue |
| Mattress | 1 | Issue |
| Throw Rug | 1 | Maximum 2' X 3'  (10' X 10' at Redwood Hall) |
| Curtains | 1 Set | Redwood Hall only -- see posting. |
| Footlocker | 1 | Standard size |
| CD Rack | 1 | Max capacity 50, plastic |
| Plastic Shelving | 1 | Max 30" wide, 6' tall, 10" deep (requires type approval) |
| Plastic Boxes | -- | To fit personal and/or room shelving storage space.   Box tops OK. |
| Clothes Hangers | 24 | Plastic |
| Fan | 1 | Max 12", clip-on or desk style |
| Picture frames | 3 | 8X10 max, no glass |
| Safety Can Opener | 1 | Approved type only. |
| Food Ware | 7 | Any combination of plastic plates, bowls, cups, sports water bottle. |
| Flat Ware | 20 | Max total combination of plastic forks, knives and spoons. |
| Water Purifier | 1 | Pitcher type, plastic, one gallon maximum. |
| Purifier Filters | 4 | N/A |
| Lamp | 1 | Clip-on type or desk lamp max 18" tall.  Florescent.  No halogen bulb. |
| Clock/alarm clock | 2 | Desk-type.  *Built-in clocks in radio or electronic devices not counted.* |
| Stuffed Animals | 2 | Under 12" any dimension. |

## PERSONAL CARE

| Item | Qty | Description |
|---|---|---|
| Eye Glasses | 2 | Prescription.  Tinted requires SCC medical approval. |
| Sunglasses | 2 | Non-reflective.  (For outside wear only.) |
| Glasses Case | 4 | Non-metal. |
| Contact Lenses | 2 | Sets of two permanent/multiple disposable.  Prescription, no color. |
| Contact Lens Cases | 2 | Non-metal. |
| Saline Solution | 2 | N/A |
| Lens Cleaner | 2 | Liquid, no alcohol. |
| Lens Steamer | 1 | N/A |
| Razors | 11 | Disposable whole razor (Bic type) or disposable head type. |
| Electric Razor | 1 | N/A |
| Dental Floss | 1 | N/A |
| Toothbrushes | 2 | Regular, or ONE electric, with maximum 5 brush heads. |
| Dental Picks | 55 | Plastic, with or without dental floss affixed (Package of 50, plus 5) |
| Deodorant | 2 | N/A |
| Sunscreen | 2 | N/A |
| Comb | 2 | Flexible plastic/hard rubber hand comb.  No sharp handle. |
| Hairbrush | 1 | Plastic, no metal, no sharp handle or decorations. |
| Bath Soap | 2 | N/A |
| Hair Conditioner | 2 | N/A |
| Mouthwash | 2 | No alcohol, no glass.  Max 16oz., total (four 4s, two 8s or one 16) |
| Denture Cleaner | 2 | No alcohol, no glass.  Max 16oz., total (four 4s, two 8s or one 16) |
| Emery Board | 2 | Cardboard backing.  No metal. |
| Nail/toenail Clipper | 2 | No clipper/knife combo.  Small file OK when part of clipper. |
| Hand Lotion | 2 | N/A |
| Hair Dryer | 1 | N/A |
| Hair/Beard Removal Product | 2 | No alcohol, non-flammable. |

*Special Edition Offender Personal Property* I.D.
rev. April 1, 2006

| STATIONERY & SUPPLIES | | |
|---|---|---|
| Magazines/Pamphlets | 10 | N/A |
| Ring Binders | 6 | N/A |
| Folders | -- | "Peechee"/similar cardboard/soft plastic, must fit available storage. |
| Address Books | 2 | N/A |
| Planners | 1 | N/A |
| Books | -- | Must fit available storage. |
| Ruler | 2 | Cloth or plastic. |
| Writing Paper | 400 | Single sheets or equivalent tablets. |
| Printer/typing Paper | 2 | Reams, white only. |
| Writing/Art Erasers | 6 | Solid or gum rubber.  May be in wooden or paper casing. |
| Newspaper | 4 | N/A |
| File Boxes | 2 | 9"X12"X17½" rough measure. |
| Pens/Pencils | 10 | Total number is 10, not 10 each type. |
| Markers | 10 | No xylene *(a toxic chemical)* |
| Photo Album | 3 | N/A |
| Posters | 5 | Stored and not on display.<br>(For posters on display, see room standards policy 230.) |

# EXHIBIT 'G'

# UNNECESSARY LOUDSPEAKER ALERTS

#*#*#* NOTE ALL alerts are called three times #*#*#
(Previous record from 2006 to Nov. 2007 lost due to power surge loss in computer memory)

| DATE | TIME | ALERT |
|------|------|-------|
| 11 17 07 | 0437 | ALL AVLBLE STAFF report to Unit 1 |
| | 0440 | Red lt " " " " |
| | 0500 | " " " " " " |
| | 0537 | " " all clear |
| | 2330 | " " " 2 |
| | | rm 117 |
| 11 21 07 | 1141 | " " Unit 5 Rm 115-A |
| 11 23 07 | 0558 | " " " 7 " 341 |
| 11 29 | 2333 | 1 100 |
| 11 30 | 0455 | 6 114 |
| | 0305 | Key Control rm |
| | 0515 | 9 176 |
| 12 3 | 1215 | Centrl serv 146 |
| 12 6 | 1150 | 2 359 |
| | 0525 | 5 118 |
| 12 7 | 1143 | 7 |
| | 1215 | 1 (3 rms) |
| 12 14 | 0118 | 5 121 |
| 12 21 | 0515 | 5 B135 |
| (this one was a calmer, quieter MALE) | | |
| 12 24 | 1245 | Lake Isabella |
| | 0518 | 1 117 |
| 12 25 | 0540 | PT. COUNT CLEAR |
| | 2300 | " " " |
| 1 1 08 | 1237 | 9 113 |
| 1 10 | 0105 | 1 118 |
| 1 14 | 1153 | Cntrl Med Serv 147 |
| 1 16 | 1248 | 9 117 |
| | 0300 | 4 217 |
| | 0303 | ALL CLEAR |
| 1 21 | 1240 | 1 161 |
| | 0111 | 2 359 |
| 1 24 | 1145 | COUNT CLEAR |
| 1 29 | 0543 | 1 108 |
| 1 30 | 1210 | MA2 300 |
| | 1105 | 9 112 |
| 1 31 | 1110 | COUNT CLEAR |
| 2 1 | 0330 | 5 117 |
| | 0333 | RED LT ALL CLEAR |
| 2 1 | 1148 | 5 117 |
| | 1152 | RED LT ALL CLR |
| 2 2 | 0354 | 5 105 |
| | 0401 | RED LT ALL CLR |
| | 0441 | COUNT CLR |
| | 1147 | PT. COUNT CLR |
| 2 3 | 0418 | PT. COUNT CLR |
| 3 19 | 0200 | 2 415 |
| | 0217 | 11 192 |
| | 1150 | COUNT IS CLEAR [at midnight] |
| 3 20 | 0417 | COUNT IS CLEAR |

| DATE | TIME | ALERT |
|------|------|-------|
| 3 20 | 2325 | COUNT CLR |
| 3 21 | 0535 | 2 200 Lake Isabell. |
| | 0537 | Red Lt Clr |
| 3 22 | 2343 | COUNT CLEAR |
| | 0153 | 9 100 |
| | 0412 | COUNT CLEAR |
| | 2346 | R&R 106 |
| | 2351 | Red lt clr |
| | 2356 | COUNT CLEAR |
| 3 23 | 2348 | COUNTCLEAR |
| 3 24 | 0112 | Unit 1 Rm 117, 104 & 115B-multiple alrts |
| | 0116 | Red lt clr |
| | 2351 | COUNT CLR |
| 3 25 | 2353 | COUNT CLR |
| 3 26 | 2400 | COUNT CLR |
| 3 27 | 0315 | Red Alert 2 200 |
| | 0318 | Red Lt All Clr |
| | 2349 | COUNT CLR |
| | 0412 | COUNT CLR |
| | 2350 | COUNT CLR |
| 3 28 | 0053 | 1 153 |
| | 0055 | Red Lt Clr |
| | 0410 | COUNT CLR |
| 3 29 | 2347 | COUNT CLR |
| 3 30 | 0410 | COUNT CLR |
| | 0627 | Red Lt Key Control Rm, Rm 115 |
| | 2222 | 14 217 |
| | 0033 | 14 275 |
| 4 1 | 0418 | COUNT CLEAR |
| 4 2 | 2345 | COUNT CLR |
| 4 3 | 0411 | COUNT CLR |
| | 2349 | COUNT CLEAR |
| 4 4 | 0341 | 14 217 |
| | 0351 | Red Lt Clr |
| | 0408 | COUNT CLEAR |
| | 2348 | COUNT CLR |
| 4 5 | 0411 | COUNT CLR |
| | 2351 | COUNT CLR |
| 4 6 | 0445 | COUNT CLR |
| | 2244 | ALARM ELEVATOR BLDG 5 |
| | 2248 | Red Lt All Clr |
| | 2347 | COUNT CLR |
| 4 7 | 1130 | Red Lt Bldg 25 "ftbll Area |
| | 1131 | red Lt CLEAR |
| 4 9 | 2305 | 2 261 |

| DATE | TIME | ALERT |
|---|---|---|
| 10 | 2339 | COUNT CLEAR |
| 11 | 0413 | COUNT CLEAR |
| | 2344 | COUNT CLEAR |
| 12 | 0545 | Rd Lt U-2   Rm 316 |
| 14 | 0529 | Rd Lt   2   215-A |
| 15 | 0153 | 5   181 |
| | 0356 | Rd Lt Kiosk 15 |
| | 2249 | Key Cntrl   116 |
| 16 | 0604 | R&R   412 |
| | 2243 | 5   115 |
| | 2245 | Rd Lt All Clr |
| | 2359 | COUNT CLR |
| 17 | 0345 | 2   217 |
| | 0349 | ALL CLR |
| | 0405 | Unit 1 Rms. 152 / 115-B, 132-A |
| | 0411 | Rd Lt All Clr |
| | 2348 | COUNT CLR |
| 18 | 0410 | COUNT CLR |
| | 2207 | COUNT CLR |
| | 2353 | COUNT CLR |
| 19 | 0409 | COUNT CLR |
| | 2341 | COUNT CLR |
| 20 | 0413 | COUNT CLR |
| 22 | 0014 | 9   114 |
| | 0150 | 4   115 |
| | 0616 | 10   217 |
| 23 | 0301 | MA1   151 |
| | 0616 | 10 215A |
| | 0617 | Rd Lt ALL CLR |
| | 2346 | COUNT CLR |
| 24 | 0405 | COUNT CLR |
| | 2341 | COUNT CLR |
| 25 | 0411 | COUNT CLR |
| | 0616 | 10 215A |
| | 0619 | Unit 10 RED lt ALL CLR |
| | 2340 | COUNT CLR |
| 26 | 0404 | COUNT CLR |
| | 2214 | COUNT CLR |
| | 2221 | 1   118 |
| | 2231 | Red Lt all Clr |
| | 2344 | COUNT CLR |
| 27 | 0409 | ALL UNITS PT. COUNT CLR |
| | 0419 | 10 215 |
| | 0420 | UNIT 10 RED LT ALL CLR |
| | 2345 | KEY CONTROL RM 116 / 2 200B |
| 28 | 0033 | |
| | 0403 | COUNT CLR |
| | 2343 | COUNT CLR |
| 29 | 0418 | ALL UNITS, PT COUNT CLR |
| | 2319 | C/O Graves play'g games w/door jambs waking pts. |

| DATE | TIME | alert |
|---|---|---|
| | 2147 | COUNT CLR |
| | 2346 | COUNT CLR |
| 5 1 | 0400 | Red Lt U- 1  115 |
| | 0402 | Rd Lt All Clr |
| | 0407 | COUNT CLR |
| | 2149 | COUNT CLR |
| | 2349 | COUNT CLR |
| 5 2 | 0411 | COUNT CLR |
| | 2140 | COUNT CLR |
| | 2346 | COUNT CLR |
| | 2352 | C/O slams bckyrd door |
| | 2356 | Red Lt U-5  115 |
| | 2357 | Red Lt All Clr |
| 5 3 | 0023 | Red Lt   1  116 |
| | 0024 | ALL UNITS- Rd Lt all Clr |
| | 0406 | ALL UNITS COUNT CLR |
| | 2141 | COUNT CLR |
| | 2348 | COUNT CLR |
| 5 4 | 0404 | COUNT CLR |
| 5 5 | 2146 | COUNT CLR |
| 5 7 | 0414 | COUNT CLR |
| 5 8 | 2144 | COUNT CLR |
| | 2350 | COUNT CLR |
| 5 9 | 0352 | Red Lt  U-6   461 |
| | 0354 | 5   363 |
| | 0356 | Units 6&7 Red Lt ALL CLEAR |
| | 0406 | All Units - Pt. COUNT CLR |
| | 0608 | Union Square Red Lt Grill   Rm 115 |
| | 2233 | Red Lt   6   158 |
| | 2235 | Red Lt ALL CLR |
| | 2239 | ALL UNITS FIRE ALARM CLR ALL PTS RTRN TO UNITS |
| | 2343 | COUNT CLR |
| 5 10 | 2203 | COUNT CLR |
| | 2347 | COUNT CLR |
| 5 11 | 0407 | COUNT CLR |
| | 2150 | Red Lt   10 217 |
| | 2353 | COUNT CLR |
| 5 12 | 0411 | COUNT CLR |
| | 0546 | RED Lt KEY Cont Rm 117 |
| | 2130 | COUNT CLR |
| | 2354 | COUNT CLR |
| 5 13 | 0416 | COUNT CLR |
| 5 14 | 2143 | COUNT CLR |
| 5 15 | 2146 | COUNT CLR |
| | 2339 | COUNT CLR |
| 5 16 | 0413 | COUNT CLR |
| | 2145 | COUNT CLR |
| | 2338 | COUNT CLR |
| 5 17 | 0414 | COUNT CLR |
| | 2152 | COUNT CLR |
| | 2344 | COUNT CLR |

| DATE | TIME | ALERT |
|---|---|---|
| 5 19 | 0556 | RED LT Key Control Rm  114 |
| | 0557 | Key Cont Red Lt Clr |
| 5 20 | 0625 | RED LT key Control Room   114 |
| 5 21 | 0555 | RED LT   U-7   516 |
| | 0556 | Treatment U-7 RED lt ALL CLEAR |
| 5 22 | 2350 | COUNT CLR |
| 5 23 | 0413 | COUNT CLR |
| | 2153 | COUNT CLR |
| | 2345 | COUNT CLR |
| 5 24 | 0410 | COUNT CLR |
| | 2147 | COUNT CLR |
| | 2343 | COUNT CLR |
| 5 25 | 0209 | RED LT   U-2   263 |
| | 0414 | COUNT CLR |
| 5 26 | 0002 | RED LT   9   117 |
| | 0541 | RED LT Key Cntrl 114 |
| | 2259 | RED LT   9   178A |
| 5 27 | 0558 | RED LT CNTRL MED Serv 146 |
| | 0600 | RED LT ALL CLR |
| 6 5 | 0216 | LOUD electronic static crackling |
| 6 6 | 0416 | LOUD static humming |
| | 2350 | LOUD static humming (lasted 60 to 80 sec. |
| 6 7 | 0108 | LOAD static buzzing |
| | 0412 | LOUD crackling |
| | 2350 | White noise crackling |
| 6 8 | 2318 | LOUD LONG static nois |
| | 2344 | White noise outburst |
| 6 9 | 2156 | LOUD and long burst of electronic static |
| | 2244 | LOUD buzzing humming |
| 6 10 | 2226 | VERY LOUD white noise |
| 6 13 | FRI | THEY FIXED SPKRS LOUDR |
| | 2126 | RED LT   1   116 |
| 6 14 | 2136 | LOUD COUNT CLR |
| | 2345 | COUNT CLR EXTREMELY loud |
| 6 20 | 2319 | RED LIGHT   U17 Rm 176 |
| | 2321 | RED Lt All CLR |
| 6 22 | 0104 | RED LT   14   215 |
| | 0106 | ALL UNITS RED LT CLR |
| 6 23 | 0542 | RED LT   7   387 |
| 6 24 | 2348 | OFF HOOK-Unit 5 staffing room one |
| 6 27 | 2330 | RED LT   13   163 |
| | 2332 | ALL UNITS RED LT CLR |
| 7 6 | 0150 | RED LT   14   216 |
| | 0152 | ALL UNITS-RED LT CLR |
| 7 6 | 2228 | RED LT   9   144 |
| | 2234 | REPEAT-RD LT   9   144 |
| 7 7 | 2329 | RED LT   13 115-C |
| | 2332 | RED LT   17 115-A |
| 7 8 | 0322 | RED LT   9   112 |
| 7 13 | 2144 | LOUD STATIC MIKE NOISI |
| 7 15 | 2149 | COUNT CLEAR |
| 7 16 | 2303 | RED LT   9   144 |