UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

FRESNO DIVISION

| | |
|---|---|
| GEORGE N. ALLEN,<br><br>     Plaintiff,<br><br>  v.<br><br>AUDREY KING and DAVID LANDRUM,<br><br>     Defendants. | Case No. 1:06-cv-01801-BLW-LMB (lead case)<br><br>**MEMORANDUM DECISION AND ORDER** |
| WAYNE P. DEBERRY,<br><br>     Plaintiff,<br><br>  v.<br><br>AUDREY KING and DAVID LANDRUM,<br><br>     Defendants. | Case No. 1:07-cv-00850-BLW (consolidated case) |

**MEMORANDUM DECISION AND ORDER - 1**

| | |
|---|---|
| JACKIE ROBINSON,<br><br>    Plaintiff,<br><br>  v.<br><br>STEPHEN MAYBERG, et al.,<br><br>    Defendants. | Case No. 1:08-cv-01339-BLW-LMB<br>(consolidated case) |
| DARRYELL FRAZIER,<br><br>    Plaintiff,<br><br>  v.<br><br>STEPHEN MAYBERG and PAM<br>AHLIN,<br><br>    Defendants. | Case No. 1:09-cv-02153-BLW<br>(consolidated case) |
| HENRY C. SCOTT,<br><br>    Plaintiff,<br><br>  v.<br><br>AUDREY KING and DAVID<br>LANDRUM,<br><br>    Defendants. | Case No. 1:07-cv-00897-BLW<br>(consolidated case) |

**MEMORANDUM DECISION AND ORDER - 2**

## INTRODUCTION

Pending before the Court is Defendants Audrey King and David Landrum's Motion for Summary Judgment (Dkt. 207) on Plaintiffs George Allen and Henry Scott's claims that two of their conditions of detention are unconstitutional under the Fourteenth Amendment. The Court has reviewed the briefs submitted by the parties and the substantial record in detail.[1] As explained below, the Court will grant Defendants' motion.

## FACTUAL AND PROCEDURAL BACKGROUND

The procedural history of this case is quite complex. For the sake of brevity, only the factual background directly applicable to this motion will be recited. A more thorough history can be found in the Court's Memorandum Decision and Order regarding Defendants' Motion to Dismiss (Dkt. 170).

Plaintiffs George Allen and Henry Scott are patients at the Department of State Hospitals Coalinga (DSH-C), committed pursuant to the California Sexually Violent Predator Act (SVPA)[2] since March 2006. *Def.'s Responses to Plaintiff Allen's Answers to Undisputed Material Facts* (hereinafter "UMF"), ¶¶ 3-4, Dkt. 219-2. Generally, Plaintiffs have put forth two claims relevant to deciding this motion, in which they allege violations

---

[1] No hearing is required pursuant to Local Rule 230(l).

[2] "The SVPA authorizes the state to seek the involuntary commitment of any person who has been convicted of certain enumerated violent sex offenses against at least two victims and who has a diagnosed mental disorder that makes the person a dangerous likely recidivist." *Jones v. Blanas*, 393 F.3d 918, 923 (9th Cir. 2004); *see also* Cal. Welf. & Inst.Code §§ 6600(a)(1), 6601(a)(1).

**MEMORANDUM DECISION AND ORDER - 3**

of their due process rights under the Fourteenth Amendment. First, they contend that night-time announcements made over the public address (PA) system are excessive in both volume and frequency, resulting in damaged hearing and disrupted sleep. Second, Plaintiffs assert that they are compelled to wear unsanitary clothing and use unclean bed linens. Additional undisputed material facts are provided below.

     1.  <u>The Department of State Hospitals Coalinga ("DSH-C")</u>

The majority of patients within the California state hospital system committed under the SVPA have been admitted to DSH-C. *UMF*, ¶ 1. Plaintiff Allen has been a patient committed to DSH-C pursuant to the SVPA since March 2, 2006. *Id*., ¶ 3. Similarly, Plaintiff Scott has been a patient committed to DSH-C pursuant to the SVPA since March 9, 2006. *Id*., ¶ 4. The DSH-C is comprised of several types of units; relevant here are two: Residential Recovery Units ("RRU") and Intermediate Care Facility Units ("ICFU"). *Id*., ¶¶ 5, 9, 11. Generally, during daytime hours, patients on both the RRUs and ICFs are allowed to move freely through the facility in the common areas, such as the library, classrooms, and cafeteria, although patients are expected to return to their units during overnight or sleeping hours. *Id*., ¶ 12. All doors leading to the individual units are secured each night at 9:00 p.m. *Id*., ¶ 13. DSH-C is divided into three sections: east, west, and center. *Id*., ¶ 18. Units 2 and 7, where Scott and Allen reside, are located on the west side of the DSH-C facility. *Id*., ¶ 19.

With regard to the RRUs, there are—at most—fifty patients housed in these. *UMF*, ¶ 5. In addition to patients, both law enforcement and non-law enforcement staff

**MEMORANDUM DECISION AND ORDER - 4**

are assigned to the RRUs. *Id*., ¶ 7. Indeed, per shift, two officers are assigned to the RRUs. *Id*., ¶ 8. Allen's living quarters have been on Unit 7, an RRU, since March 2, 2007. *Id*., ¶ 14. Since 2009 or 2010, Allen's living quarters have been the same single-person room on Unit 7. *Id*., ¶ 15.

With regard to the ICF units, there are no more than fifty patients housed in these. *UMF*, ¶ 9. In contrast to the RRUs, only non-law enforcement staff are assigned to ICF units, although officers do make rounds on ICF units. *Id*., ¶ 10. Scott's living quarters has been on Unit 2, an ICF, since November 6, 2009. *Id*., ¶ 16. Scott has been in the same single-person living quarters since sometime after April 2013. *Id*., ¶ 17.

2.  <u>The PA System Claims</u>

Within DSH-C, speakers are located in the hallways (inside and outside of each unit), in patients' rooms, day rooms, quiet rooms, restrooms, nursing stations, closets, and the patients' shower area. *Id*., ¶ 24. In Allen's and Scott's living quarters, there is a speaker connected to the PA system, located in the middle of the ceiling. *Id*., ¶ 25. During the day, several different types of announcements over the PA system may be made. These include: (1) announcements for "calling the count"; (2) announcements for testing, medical, staff drills, or fire drills; (3) "code blue" announcements, which indicate a medical emergency; (4) various non-emergency announcements; and (5) "red light alarms," which alert staff to a problem or potential problem. *Id*., ¶¶ 29, 30, 38.

Announcements for "calling the count"—which alert patients to return to their units to be counted—are made at the following times of the day: 11:05 a.m., 4:05 p.m.,

and 8:45 p.m. *Id.*, ¶ 26. After the count is completed, a "count clear" announcement is made hospital-wide over the PA system following the 11:05 a.m. and 4:05 p.m. counts only. *Id.*, ¶ 27. Additional counts at 11:30 p.m. and 4:00 a.m. occur but are not announced, as patients should have returned to their units by those hours, and can be counted by staff without the need for an announcement. *Id.*, ¶ 28.

With regard to the second category of announcements—testing, medical, staff drills, or fire drills—DSH-C policy is that there are to be no such announcements during sleeping hours, which are generally 10:00 p.m. to 6:00 a.m. *Id.*, ¶ 32. This policy was implemented in 2015 so that patients' sleep is not disturbed. *Id.*, ¶ 33.

Other non-emergency announcements include temperature announcements for heat-sensitive patients, unscheduled all counts, unplanned fire alarms, and red light testing. *Id.*, ¶ 36. Non-emergency announcements are not made during sleeping hours. *Id.*, ¶¶ 32, 38. Conversely, code blue and red light alarms may occur during sleeping hours. *Id.*, ¶ 34.

A red light alarm may be initiated for a number of reasons; for example, if there is an altercation between a patient and a staff member or between patients. *Id.*, ¶ 35. Another example of an event that has prompted a red light alarm includes medical emergencies and uncooperative patients that require staff to summon additional support. *Id.*, ¶ 37. Current DSH-C policy mandates that if a red light alarm occurs in a unit located on the west side of the facility, the announcement is broadcast only to speakers located on the west side of the facility, but not on the units located in the east or center sections. *Id.*,

¶¶ 22, 30.[3] Similarly, red light alarms occurring in the east section are broadcast only in the east section, and red light alarms occurring in the center sections are broadcast only in the center sections. *Id.*, ¶¶ 21, 23. DSH-C requires that a red light alarm and the location of the event giving rise to the activation of the alarm are to be announced twice, one right after the other. *Id.*, ¶ 40.[4] The announcement is preceded by a "ding," which is louder than the announcement itself. *Id.*, ¶ 41. When a red light alarm is announced during the non-sleeping hours of approximately 6:00 a.m. to 10:00 p.m., it is followed by an announcement of "all clear" indicating that whatever event gave rise to the alarm has been resolved. *Id.*, ¶ 42. In contrast, when the red light alarm is made during sleeping hours (again, between 10:00 p.m. to 6:00 a.m.), the "all clear" announcement is not made over the PA system. *Id.*, ¶ 43. Instead, during sleeping hours, personnel are notified via radio that the red light alarm has been cleared. *Id.*, ¶ 44. All staff wear a personal alarm device that they may activate to notify the Communications Center that a red light alarm should be initiated. *Id.*, ¶ 45. If an officer observes an event that warrants initiating a red light alarm, DSH-C policy requires the officer to activate his or her personal alarm device in order to notify the Communications Center. *Id.*, ¶ 47. Using his or her radio, the officer may then provide the Communications Center with additional details regarding where the incident is occurring. *Id.*, ¶ 48.

---

[3] Allen notes that this is new system that has only been in place since February of 2015; prior to that, he contends that a red light alarm was heard—but not necessarily broadcast—throughout the hospital. *UMF*, ¶¶ 21–23.
[4] For example, "Red Light Alarm, Unit 2; Red Light Alarm, Unit 2." *Id.*, ¶ 40.

**MEMORANDUM DECISION AND ORDER - 7**

On both RRUs and ICFUs, when a red light alarm is announced, all staff—officers and non-law enforcement staff alike—on the unit and in adjacent units are expected to respond by going to the location announced over the PA system. *Id.*, ¶ 51. The announcements are made both over the PA system and on officers' radios; as such, the PA system acts as a back-up to radio communication. *Id.*, ¶ 58. But only officers wear radios; non-law enforcement staff do not. *Id.*, ¶¶ 59, 61. Thus, non-law enforcement staff—including psychiatric technicians, nurses, social workers, psychologists, and rehabilitation therapists—rely entirely on the PA system and radio communication in the nurses' station to be alerted to red light or other announcements. *Id.*, ¶¶ 52, 62. Because no law enforcement officers are assigned to ICF units and since the non-law enforcement staff do not wear radios, it is even more important on those units for staff to be able to hear alarms, since they may be the first ones to respond to a violent incident or medical emergency. *Id.*, ¶¶ 64–66. Neither Allen nor Scott dispute that the PA system is crucial for the safety of patients and staff. *Id.*, ¶ 54.

In July and October of 2014, Certified Industrial Hygienist Tim Bormann conducted a series of noise monitoring tests in Units 2 and 7 on the west side of the facility. *Id.*, ¶ 111. Bormann also conducted noise monitoring tests in the quiet rooms in Unit 2 and Unit 7, as well as in Allen's living quarters and Scott's living quarters. *Id.*, ¶¶ 111–116. Based on the results of Bormann's testing, he concluded that noise levels during announcements are not of sufficient duration or intensity where they could lead to damaged hearing. *Id.*, ¶ 142. Bormann also concluded that average noise levels measured

during announcements were less than 69 decibels ("dBA") and their duration was less than 20 seconds. *Id.*, ¶ 143. Put in more practical terms and according to Bormann, the July and October 2014 testing indicated that the announcements were loud enough to be analogous to being awakened in the middle of the night by a loud automobile or a barking dog. *Id.*, ¶ 144.

Testing of the noise level of the PA system at DSH-C occurs when new equipment is installed and in response to complaints. *Id.*, ¶ 145. While Allen and Scott have complained that the volume of the PA system is too loud and disrupts their sleep, other patients and staff have complained that the PA system announcements are not loud enough. *Id.*, ¶¶ 147, 148. If testing reveals that announcements exceed 65 decibels in a patient's living quarters, adjustments are made so that the volume level is reduced to at or below the 65-decibel level. *Id.*, ¶ 151. The configuration of the PA system does not allow for the speakers to be turned on and off in patients' rooms; rather, the only way that speakers in patient's living quarters can be silenced is to disconnect the speaker wiring. *Id.*, ¶ 161–163. The volume of the PA system can be adjusted in one of two ways: through adjusting the amplifier, the volume to a large area can be adjusted upward or downward, or changes can be made to the software/programming, and those changes must then be uploaded to the computer system. *Id.*, ¶ 155, 157. This latter type of adjustment is labor-intensive, requires reprogramming of the hospital, and can result in a shutdown of several critical operations of this hospital because the PA system also controls the electronic locks, doors, and gates. *Id.*, ¶ 160.

**MEMORANDUM DECISION AND ORDER - 9**

Generally, Allen alleges that the announcements made over the PA system in his living quarters have damaged his hearing. *Id.*, ¶ 164. Both Allen and Scott allege that the announcements made in their living quarters disturb their sleep. *Id.*, ¶ 173. With respect to their PA claims, Allen and Scott seek only declaratory and injunctive relief. *Id.*, ¶ 163. In particular, they seek to enjoin announcements during the hours of 9:00 p.m. to 7:00 a.m., or to allow the speakers in their rooms be disconnected. *Def.'s MSJ*, p. 27, Dkt. 207.

   3.   The Laundry Claims

Both Allen and Scott claim that they are expected to wear clothing and use bed linens that have not been properly laundered. *UMF*, ¶ 181, 182. Again, with regard to these claims, Allen and Scott seek only injunctive and declaratory relief. *Id.*, ¶ 183.

The California Prison Industry Authority ("CALPIA") contracts with California state hospitals to provide clothing and laundry services. *Id.*, ¶ 184. Laundry from DSH-C is typically sent to the state prison facility at the CALPIA laundry facility in Wasco, unless there is some problem with machinery or a prison lock-down, in which case it is sent to another facility such as Corcoran State Prison or Valley State Prison. *Id.*, ¶ 187. Both patient clothing and bed linens are laundered at the CALPIA facility at Wasco. *Id.*, ¶ 188. As of October 2014, soiled laundry is picked up from DSH-C on Mondays and returned clean on Wednesdays; Tuesday's soiled laundry is returned clean on Thursdays; Wednesday's soiled laundry is returned clean on Fridays; Thursday's soiled laundry is returned clean on Monday; and Friday's soiled laundry is returned clean on Tuesday. *Id.*, ¶ 190. Both CALPIA and DSH-C (for the small amount of items laundered in-house)

adhere to California regulations that govern laundering of patient clothing. *Id.*, ¶ 191. CALPIA also adheres to laundry services standards outlined in the Occupations Safety and Health Act (OSHA) and state regulations. *Id.*, ¶ 192.

DSH-C policy prohibits patients committed pursuant to the SVPA from possessing their own personal clothing, with the exception of shoes and hats. *Id.*, ¶ 215. Such patients are provided pants, dress shirts, t-shirts, boxer shorts, socks, jackets, shoes with Velcro closures, shorts, and shower shoes. *Id.*, ¶ 216. SVPA patients at DSH-C generally have two sets of clothing: the one set that they are wearing, plus one additional set that they wore the day before. *Id.*, ¶¶ 218, 221.

Bed linens may be exchanged once per week, and bedspreads are changed once every three months. *Id.*, ¶ 219. Clothing and linens are not distributed to patients on a set schedule; rather, patients are expected to visit the laundry window when they want clean articles of clothing or bed linens. *Id.*, ¶ 220. Patients are allowed a one-for-one clothing exchange (for example one soiled t-shirt and one pair of soiled pants in exchange for one clean t-shirt and one pair of clean pants) on a daily basis. *Id.*, ¶ 222.

If it appears that an article of clothing given to a patient has not been laundered properly, the patient may return that item for a replacement. *Id.*, ¶ 231. Defendants maintain that through the rigorous washing process, patient clothing and linens can sometimes be faded or even stained; but the items are nonetheless clean and sanitary. *Id.*, ¶ 211. If—after staff or a patient worker inspects the supposedly dirty item—it is determined that the item is nonetheless clean, it will be given back to the patient. *Id.*, ¶

213. However, at that point, the patient is not *required* to wear a supposedly dirty item; he may choose to wear one of his spare pairs of clothing, and can exchange the allegedly dirty item on another day. *Id.*, ¶ 214.

Allen's practice is to have one set of clothing that he wears, and a second set that he launders himself, instead of replacing it at the laundry window. *Id.*, ¶ 237. When his first set of clothing gets dirty, he changes into his second set and hand washes the first set himself. *Id.*, ¶ 238. He alternates sets, handwashing in between wears, until the clothing wears out. *Id.*, ¶ 239. At that point, he seeks a new set from the laundry window. *Id.*, ¶ 240. All told, Allen visits the laundry window about twice per week. *Id.*, ¶ 241. Likewise, Scott chooses to hand wash some of his clothing as well. *Id.*, ¶ 242. Occasionally, there are shortages of clean clothing, but patients are not forced to wear clothing that has not been properly laundered. *Id.*, ¶ 243. At most, they may need to wear the clothes they already have on for another 24 hours. *Id.*, ¶ 243. Thus, if there is a shortage of clothing, the patient may (1) continue to wear what he has on; (2) change into his second set; or (3) ask for a larger or smaller size of clothing which is furnished if available. *Id.*, ¶ 244. If a patient receives a pair of underwear that has not been properly laundered, he may return it to the laundry window for a new pair. *Id.*, ¶ 246.

In December 2013 and in response to concerns from patients that clothing and bed linens were not being properly laundered, a committee that included patient members was formed to address the patients' concerns regarding the laundry. *Id.*, ¶ 248. As one outcome of the committee, a policy was adopted whereby improperly laundered or

damaged clothing is sent back to CALPIA. *Id*., ¶ 251. Additional purchase orders were made with CALPIA to increase clothing inventory, and in January and February of 2014, DSH-C secured approximately 100,000 new items of clothing to combat clothing shortages. *Id*., ¶ 253.

Defendants moved for summary judgment on Scott's PA system and laundry claims, which are Scott's only remaining claims in this case. Defendants' motion is for partial summary judgment as against Allen, because he has PA system and laundry claims, as well as pending computer-related claims that will be dealt with in a subsequent order.

## LEGAL STANDARDS

### 1. Summary Judgment

Summary judgment is appropriate where a party can show that, as to any claim or defense, "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  One of the principal purposes of the summary judgment "is to isolate and dispose of factually unsupported claims . . . ." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986).  It is "not a disfavored procedural shortcut," but is instead the "principal tool[ ] by which factually insufficient claims or defenses [can] be isolated and prevented from going to trial with the attendant unwarranted consumption of public and private resources."  *Id*. at 327.  "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment."  *Anderson v. Liberty Lobby, Inc.*, 477

U.S. 242, 247-48 (1986).  There must be a genuine dispute as to any material fact—a fact "that may affect the outcome of the case."  *Id*. at 248.

The evidence must be viewed in the light most favorable to the non-moving party, and the Court must not make credibility findings.  *Id*. at 255.  Direct testimony of the non-movant must be believed, however implausible.  *Leslie v. Grupo ICA*, 198 F.3d 1152, 1159 (9th Cir. 1999).  On the other hand, the Court is not required to adopt unreasonable inferences from circumstantial evidence.  *McLaughlin v. Liu*, 849 F.2d 1205, 1208 (9th Cir. 1988).

The moving party bears the initial burden of demonstrating the absence of a genuine dispute as to material fact.  *Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001)(en banc).  To carry this burden, the moving party need not introduce any affirmative evidence (such as affidavits or deposition excerpts) but may simply point out the absence of evidence to support the nonmoving party's case.  *Fairbank v. Wunderman Cato Johnson*, 212 F.3d 528, 532 (9th Cir.2000).

This shifts the burden to the non-moving party to produce evidence sufficient to support a jury verdict in her favor.  *Deveraux*, 263 F.3d at 1076.  The non-moving party must go beyond the pleadings and show "by her [ ] affidavits, or by the depositions, answers to interrogatories, or admissions on file" that a genuine dispute of material fact exists.  *Celotex*, 477 U.S. at 324.

However, the Court is "not required to comb through the record to find some reason to deny a motion for summary judgment."  *Carmen v. San Francisco Unified Sch.*

*Dist.*, 237 F.3d 1026, 1029 (9th Cir. 2001) (quotation omitted).   Instead, the "party

opposing summary judgment must direct [the Court's] attention to specific triable facts."

*Southern California Gas Co. v. City of Santa Ana*, 336 F.3d 885, 889 (9th Cir. 2003).

## 2.  Conditions of Detention

To determine whether conditions of confinement of civilly committed individuals

violate the constitution, courts look to the substantive due process clause of the

Fourteenth Amendment. *Youngberg v. Romeo,* 457 U.S. 307, 321–22 (1982); *Jones v.

Blanas,* 393 F.3d 918, 931–32 (9th Cir. 2004). Civilly committed persons have a

substantive due process right to be free from restrictions that amount to punishment.

*United States v. Salerno,* 481 U.S. 739, 746–47 (1987); *Bell v. Wolfish,* 441 U.S. 520,

535 (1979). "There is no constitutional infringement, however, if restrictions are but an

incident of some other legitimate government purpose." *Valdez v. Rosenbaum,* 302 F.3d

1039, 1045 (9th Cir. 2002) (internal citations omitted).

In order to be permissible, restrictions must (1) have a legitimate, non-punitive

purpose and (2) not appear excessive in relation to that purpose. *Bell,* 441 U.S. at 538–39.

Due process requires that civil detainees' conditions of confinement bear some

reasonable relationship to the purpose for which they are committed. *Seling v. Young,* 531

U.S. 250, 265 (2001). Legitimate, non-punitive government interests include ensuring a

detainee's presence at trial, maintaining jail security, and effective management of a

detention facility. *Jones*, 393 F.3d at 932.

Finally, although civilly detained persons must be afforded more considerate treatment and conditions of confinement than criminals whose conditions of confinement are designed to punish, courts may rely on decisions defining the constitutional rights of prisoners, as they establish a floor for constitutional rights of persons detained under a civil commitment scheme. *Padilla v. Yoo*, 678 F.3d 748, 759 (9th Cir. 2012) (citations omitted).

## ANALYSIS

**1. As a matter of law, the PA system claims do not rise to the level of a constitutional violation.**

Plaintiffs allege that the PA system violates their constitutional rights because night-time alarms are so loud and frequent that they interrupt their sleep and cause hearing damage. They contend that there are alternative, less harsh methods of alerting staff to emergencies. In particular, Plaintiffs seek to enjoin announcements during the hours of 9:00 p.m. to 7:00 a.m., or to allow the speakers in their rooms to be disconnected. However, as further discussed below, Defendants have presented evidence that the announcements are relatively infrequent, at acceptable decibel levels, and promote the legitimate, non-punitive interest in protecting patients and staff.

Civil detainees have a substantive due process right against restrictions that amount to punishment. *See Bell*, 441 U.S. at 535. Generally, a challenged condition of confinement does not constitute punishment if it serves a "legitimate non-punitive purpose." *See Jones*, 393 F.3d at 932. The Government must show that non-punitive

interests justify the conditions of detainees, and show that the restrictions imposed on such detainees were not excessive in relation to those interests. *Id.*

Here, Plaintiffs agree that the PA system serves an essential safety purpose. Accordingly, DSH-C must be afforded broad discretion in implementing its PA system. "[M]aintaining institutional security and preserving internal order and discipline are essential goals that may require limitation or retraction of the retained constitutional rights of both convicted prisoners and pretrial detainees." *Bell,* 441 U.S. at 547. Since problems in detention facilities are not easily solved, administrators "should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Id.* at 547. "[I]n the absence of substantial evidence in the record to indicate that the officials have exaggerated their response to these considerations, courts should ordinarily defer to their expert judgment in such matters." *Id.* at 548 (quoting *Pell v. Procunier,* 417 U.S. 817, 827 (1974)).

The record in this case supports Defendants' assertion that the use of the PA system as it currently stands is not an exaggerated response to reasonable safety concerns.[5] First, only alarms deemed essential to the safety and security of staff and patients are announced during sleeping hours. *Def.'s Statement of Undisputed Facts*, ¶¶ 32-34, Dkt. 207-2. Indeed, of the myriad types of alarms that are sounded within the

---

[5] It seems that over the years, DSH-C has made several improvements to the PA system and to its use thereof, perhaps even as a result of this lawsuit. The Court acknowledges that there may very well have been past deficiencies with the use of the PA system, but it must evaluate the PA system procedures as they currently stand.

MEMORANDUM DECISION AND ORDER - 17

walls of DSH-C, only red light and code blue alarms are made during sleeping hours.
*UMF*, ¶ 31–32, 34–35, 37–38, 54–75. Again, red light alarms are used to alert staff to a
problem such as an altercation between staff and patient or between patients, while code
blue alarms are triggered by medical emergencies. These alarms plainly serve the
legitimate governmental purpose of protecting both patients and staff. DSH-C is correct
to be concerned about staff and patient safety. It submitted undisputed evidence that for
the 2013 calendar year, there were 215 patient assaults on other patients, 106 patient
assaults on non-law enforcement staff, and 22 patient assaults on officers. *Id*. ¶¶ 70–72.
For the 2014 calendar year, there were 190 patient assaults on other patients, 95 patient
assaults on non-law enforcement staff, and 9 patient assaults on officers. *Id*., ¶¶ 73–75.
DSH-C did not clarify when the assaults took place (daytime versus nighttime) or in
which sections of the hospital the assaults took place (center, west, or east side).
Nevertheless, it is evident that DSH-C has reasonable safety concerns given the number
of assaults recorded each year.

And, DSH-C has proffered convincing evidence that its use of the PA system is
not an exaggerated response to those reasonable safety concerns. DSH-C submitted
evidence that for the sixteen-month period of July 1, 2013 through October 31, 2014, red
light alarms sounded on one or more occasions during 177 overnight periods. *UMF*, ¶ 92.
During that same period, the red light alarm sounded one time during 132 of the 177 total
nights in which a red light alarm was sounded. *Id*., ¶ 93. Put another way, during the
same sixteen-month period, no red light alarms were announced for approximately 66%

of the overnight periods on the west side of the facility, where Allen and Scott both reside. *Id.* ¶ 98. When a red light alarm did sound, only one announcement was made approximately 74% of the time. *Id.*, ¶ 99.

DSH-C submits that red light alarms are broadcast only to the section in which the triggering event took place. *Id.*, ¶ 21. So if an event triggering a red light alarm occurs in the east side of the facility, the announcement is broadcast only on the east side, but not on the west side or center section. *Id.* Allen admits this is DSH-C's procedure, but asserts that this is a new system. Allen claims that prior to February of 2015, alarms were heard—but not necessarily broadcast—throughout the hospital. *Id.*, ¶ 21. As a result, he maintains that the number of alarms reported by DSH-C should be 3 to 4 times higher. *Id.*, ¶ 76. For his part, Scott states that prior to 2013, all alarms were heard throughout the hospital and "occasionally still are." *Scott's Opp. to UMF*, Dkt. 218, ¶ 21. In his opposition brief, Allen cites to a single instance where he heard a red light alarm from the east side, while he was on the west side. *Allen Resp.*, Dkt. 214, p. 3. These allegations are *de minimus* and fail to create a genuine issue of material fact that red light alarms from the east side are regularly broadcast into the Plaintiffs' sleeping quarters on the west side. Importantly, it is not in dispute that at least now, DSH-C's policy is to broadcast red light alarms only to the section—center, west, or east—in which the event triggering the alarm took place.

Allen and Scott have failed to create a genuine issue of material fact regarding the frequency of the red light alarms. Allen's statement that the red light alarms reported by

DSH-C should be "3-4 times" higher is not supported by any evidence. For example, his declaration lacks any statement regarding the number of red light alarms during the relevant period. Furthermore, Allen and Scott do not dispute that DSH-C's *current* practice is to sound red light alarms in only the section in which it is relevant. Moreover, the red light alarms that Plaintiffs take issue with were, during a relevant sixteen-month period, nonexistent 66% of the time. And when they did sound, 74% of the time the alarm was sounded only once. This frequency is a far cry from the "unrelenting, nerve-racking din[,]" "constant racket[,]" or "relentless roar" that has been held to be a constitutional violation. *See Toussaint v. McCarthy*, 597 F. Supp. 1388, 1397–98 (N.D. Cal. 1984), *aff'd in part, rev'd in part*, 801 F.2d 1080 (9th Cir. 1986). Accordingly, the Court finds as a matter of law that the frequency of red light alarms is not an exaggerated response to DSH-C's reasonable safety concerns.

Second, the volume of the alarms is not excessive or punitive in nature. DSH-C has presented evidence that noise monitoring was conducted in Units 2 and 7 on the west side of DSH-C, Allen's and Scott's living quarters, and in the Unit 2 and 7 quiet rooms by Certified Industrial Hygienist Tim Bormann. *UMF*, ¶¶ 111–115. Allen's living quarters was tested on two separate occasions using test announcements. Results indicated that peak levels[6] of the test announcements were measured at 78.9 dBA and 71.1 dBA, and the average noise level during the test announcement was 65.5 dBA and

---

[6] The "peak level" of the announcement likely refers to the so-called "ding" that signals the announcement is beginning. The parties agree that the "ding" that precedes the announcement is louder than the announcement itself. *UMF*, ¶ 41.

63.9 dBA. *Id.*, ¶¶ 137–38.[7] Further, Bormann's noise monitoring survey indicated that

average noise levels measured during announcements were less than 69 dBA and their

duration was less than 20 seconds. Id., ¶ 143. Bormann concluded that noise levels during

announcement periods are not of sufficient duration or intensity to lead to damaged

hearing. *Id.*, ¶ 142.[8]

In contrast, in *Toussaint*, the district court found that the volume and frequency of

noise within the prisons at issue did constitute an unconstitutional condition of

confinement. *Toussaint*, 597 F. Supp. 1388, 1397–98 (N.D. Cal. 1984), *aff'd in part, rev'd*

*in part*, 801 F.2d 1080 (9th Cir. 1986). There, an expert measured sound levels and found

that "the typical average daytime sound level is in the range of 70 to 75dBa, a level he

likened to a noisy vacuum cleaner or a freight train at a distance of about 100 feet." The

same expert found that after midnight, "dBa levels drop, reaching an average low in the

---

[7] Allen disputes these findings and alleges that DSH-C improperly adjusted the PA system levels downward prior to Mr. Bormann's arrival. *UMF*, ¶ 137. For this proposition, Allen cites to his own declaration and that of Edward Johanneck. Allen's declaration indicates that prior to Mr. Bormann's tests, a DSH-C staff member "adjusted the output of the decibel level" of the speaker in his sleeping area. *Allen's Dec.*, p. 3, Dkt. 214. Mr. Johanneck testified that he "was physically present when DSH-C staff entered into [Allen's] sleeping area to test the PA Speaker in Mr. Allen's room after adjustment of the volume. This occurred on October 7, 2014. . . . It wasn't until October 9, 2014 that I realized the reason(s) why Mr. Allen's PA Speaker in his room was adjusted and tested when Mr. [Bormann] . . . showed up to test the speaker in Mr. Allen's room." *Johanneck Dec.*, Dkt. 214, p. 40.  This information is not sufficient to create a genuine issue of material fact. Taking Allen's and Johanneck's declarations as true does not necessarily cast doubt on the results of Mr. Bormann's tests.

[8] Allen also asserts generally that his hearing has been damaged by the PA system. *Allen Resp.*, Dkt. 214, p. 11. Allen's declaration indicates that in 2007, he complained to DSH-C medical staff about pain and loss of hearing and he was treated with an ear flush for excessive ear wax. *Allen Dec.*, p. 2, Dkt. 214. Seven years later, in 2014, Allen complained about pain in his left ear. He received another ear flush and was told that the pain was likely caused by his hypertension medicine. *Id*. There is no evidence in the record—aside from Allen's self-diagnosis—that Allen's ear-related-woes are caused by the PA system. To the contrary, Mr. Bormann concluded that the PA system was not so loud as to be able to damage patients' hearing and there is no evidence in the record to refute that finding.

**MEMORANDUM DECISION AND ORDER - 21**

range of 60 dBa between 5 and 6 o'clock a.m. This compares with a noisy office." *Id*., at

1397. Notably, these are average, constant sound levels. In the present case, the alarms

complained of do not last longer than twenty seconds. Here, the average noise levels of a

twenty-second announcement at less than 69 dBA are not punitive in nature.[9]

 Finally, the injunctive relief that Plaintiffs propose is not conceivable given the

important purpose the red light and code blue announcements have. If, as Plaintiffs wish,

no alarms whatsoever were sounded between the hours of 9:00 p.m. to 7:00 a.m., that

could potentially endanger patients and non-radioed staff who may happen to be in a

patient's living quarters. Or, if the speakers were disconnected from patients' rooms, then

certain patients may very well miss daily routine announcements, in addition to those

announcements that may keep them safe.

In sum, there is no evidence in the record that DSH-C's use of the PA system is

punitive in nature, or excessive in relation to the purpose the announcements serve. The

night-time announcements are no doubt annoying to patients trying to sleep; however,

such annoyances do not rise to the level of a constitutional violation. *See Lundsford v.

Bennett*, 17 F.3d 1574, 1580 (7th Cir. 1994) ("[s]ubjecting a prisoner to a few hours of

periodic loud noises that merely annoy, rather than injure the prisoner does not

demonstrate a disregard for the prisoner's welfare"); *Ajaj v. U.S.*, 479 F. Supp.2d 501,

511 (D.S.C. 2007) (evidence that the noise level was unpleasant and annoying found

---

[9] That the volume of the announcements is not punitive in nature is further supported by DSH-C's policy of testing noise levels in response to patient complaints. *Id*., ¶ 145. If a patient complains that the sound level is too loud in his living quarters, staff conducts decibel testing, using 65 decibels as a general guideline for the upper limit. *Id*., ¶ 150.

insufficient to establish a constitutional or negligence claim); *Peterkin v. Jeffes*, 855 F.2d 1021, 1027 (3d Cir. 1988) (noise, while "irritating," is not unconstitutional). Again, DSH-C must be afforded "wide-ranging deference" in the execution of policies used to maintain institutional security. Here, Defendants' PA system policies are not excessive in relation to the legitimate, non-punitive purpose of providing for its patients' and staff members' safety.

**2. As a matter of law, Plaintiffs' laundry claims do not give rise to a constitutional violation.**

Plaintiffs allege generally that their clothing and bed linens are not laundered properly, and that often there are shortages of non-stained clothing. Scott appears to take issue primarily with the stains on the clothing, but does not necessarily dispute that the same is technically "clean." ("It doesn't matter how 'clean and sanitary' the clothing is by DSH-C's standards. Patients will not wear clothing that is stained with what seems to be feces, urine, strong grass stains, oil or full of hair, 'faded or not.'") *Scott's Opp. to UMF*, Dkt. 218, p. 58. For his part, Allen takes issue primarily with the availability of clean clothing, and contends that when there are shortages of clean clothing, he is "forced to wear dirty laundry." *UMF*, ¶ 243.

The Eighth Amendment requires prison officials to provide all prisoners with the basic necessities of life, which include food, clothing, shelter, sanitation, medical care, and personal safety. *See Farmer v. Brennan*, 511 U.S. 825, 832 (1994). Thus, DSH-C is constitutionally required to provide Plaintiffs with clean clothing and bedding on a regular basis. *See Toussaint v. Rushen*, 553 F. Supp. 1365, 1379 (N.D. Cal. 1983).

Defendants have correctly noted that forcing detainees to go two days without a new set of clean clothing does not ordinarily result in a constitutional violation but that a gap of several days may. *See Rainwater v. McGinniss*, No. 2:11-CV-0030, 2012 WL 3308894, at *12 (E.D. Cal. Aug. 13, 2012).

DSH-C's laundry procedures are not in dispute. SVPA patients at DSH-C generally have two sets of clothing: the one set that they are wearing, plus one additional set that they wore the day before. *UMF*, ¶¶ 218, 221. Bed linens may be exchanged once per week, and bedspreads are changed once every three months. *Id.*, ¶ 219. Clothing and linens are not distributed to patients on a set schedule. Instead, patients are expected to visit the laundry window when they want clean articles of clothing or bed linens. *Id.*, ¶ 220. Patients are allowed a daily one-for-one clothing exchange (for example, one soiled t-shirt and one pair of soiled pants in exchange for one clean t-shirt and one pair of clean pants) on a daily basis. *Id.*, ¶ 222.

If it appears that an article of clothing given to a patient has not been laundered properly, the patient may return that item for a replacement. *Id.*, ¶ 231. If—after staff or a patient worker inspects the supposedly dirty item—it is determined that the item is nonetheless clean, it will be given back to the patient. *Id.*, ¶ 213. However, at that point, the patient is not *required* to wear a supposedly dirty item; he may choose to wear one of his spare pairs of clothing, and can exchange the allegedly dirty item on another day. *Id.*, ¶ 214.

Occasionally, there are shortages of clean clothing, but patients are not forced to wear clothing that has not been properly laundered. *Id*., ¶ 243. At most, they may need to wear the clothes they already have on for another 24 hours. *Id*., ¶ 243. Thus, if there is a shortage of clothing, the patient may (1) continue to wear what he has on; (2) change into his second set; or (3) ask for a larger or smaller size of clothing which is furnished if available. *Id*., ¶ 244.

Even the worst possible outcome that Plaintiffs may be subjected to—wearing clothing for a second 24-hour period—does not give rise to a constitutional violation. There is no evidence in the record that Plaintiffs are *forced* to wear unsanitary clothing, or purposefully provided with such. Instead, the evidence demonstrates that in the event a patient is provided with clothing or linens that need to be re-laundered, they have at least three remedies available to them. These remedies—continue to wear the clothing for another 24 hours; change into a second set; or ask for a larger or smaller size of clothing which is furnished if available—are adequate and reasonable under the circumstances. Defendants are entitled to summary judgment as to this claim.

## ORDER

**IT IS ORDERED** that the Defendants' Motion for Summary Judgment (Scott Case) and Partial Summary Judgment (Allen Case) (Dkt. 207) is hereby **GRANTED**.



DATED: August 16, 2016

_____

B. Lynn Winmill
Chief Judge
United States District Court