# UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| GEORGE N. ALLEN,<br><br>        Plaintiff,<br><br>   v.<br><br>AUDREY KING and JACK CARTER,<br><br>        Defendants. | Case No. 1:06-cv-01801-BLW-LMB (lead case)<br><br>**MEMORANDUM DECISION AND ORDER** |
| WAYNE P. DEBERRY,<br><br>        Plaintiff,<br><br>   v.<br><br>AUDREY KING and DAVID LANDRUM,<br><br>        Defendants. | Case No. 1:07-cv-00850-BLW (consolidated case) |

JACKIE ROBINSON,

          Plaintiff,

     v.

STEPHEN MAYBERG, et al.,

          Defendants.

Case No. 1:08-cv-01339-BLW-LMB
(consolidated case)

DARRYELL FRAZIER,

          Plaintiff,

     v.

STEPHEN MAYBERG and PAM
AHLIN,

          Defendants.

Case No. 1:09-cv-02153-BLW
(consolidated case)

**MEMORANDUM DECISION AND ORDER - 2**

## INTRODUCTION

Plaintiffs, who are statutorily designated sexually violent predators ("SVPs") are proceeding *pro se* in this action. Multiple motions are pending before the Court (Dkts. 217, 226–229, 232, 243), but primarily at issue here is whether Defendants' restriction of Plaintiffs' electronic devices constitutes an unconstitutional condition of confinement. Pursuant to Local Rule 230(l), all motions shall be submitted on the record without oral argument.

## BACKGROUND

Beginning in 2006, several SVPs at the Department of State Hospitals-Coalinga ("DSH-C"), including Plaintiffs Allen, DeBerry, Frazier, and Robinson, filed complaints in federal court alleging various conditions of confinement claims. Related cases were consolidated and the parties participated in a triage conference as to some of Plaintiffs' claims, including the claims at issue here. Those claims came to be known as Plaintiffs' "computer claims." Generally, Plaintiffs allege that the confiscation and restriction of possession of their electronic devices violates their constitutional rights. With regard to the computer claims, the relevant facts are not materially in dispute.

Plaintiffs Allen, Frazier, DeBerry, and Robinson are patients at DSH-C and are confined there pursuant to the Sexually Violent Predator Act ("SVPA"). *Def.'s Reply to Pl.s' Resp. to Def.'s Undisputed Material Facts* (hereinafter "*UMF*"); ¶ 4, Dkt. 240. In late July of 2006, DSH-C patients were—for the first time—allowed to own and possess their own laptop computers through a test program provided by Administrative Directive

("AD") 654. *UMF*, ¶ 5. AD 654 also prohibited devices or equipment that enabled private communications with others; as well as games, movies, or electronic images that depicted overt sexual acts or violence with adults and children. *Id*., ¶ 6. Finally, AD 654 also expressly reserved the administration's right to prohibit items deemed to be a safety or security threat. *Id*., ¶ 7.

Following the implementation of this test program, numerous safety and security violations were discovered, including: patients' widespread distribution of pornographic material, including child pornography; audio recordings of staff and patient conversations within the hospital; widespread distribution and sharing of data encryption software; widespread distribution and sharing of data concealing software; and computerized street map and atlas software. *Id*., ¶ 8. According to the Plaintiffs, it was hospital staff that sold the illicit devices to patients at a premium. *Id*. Eventually, a risk assessment was conducted at DSH-C. The results indicated that patients' continued use of their existing wireless-capable devises put the facility at risk of patients gaining internet access, and gaining home and business network access. *Id*., ¶ 9.

Only seven months after AD 654 was implemented, on February 28, 2007, a high-rate of security risks and incidents forced a moratorium on the patient-owned computer policy. *Id*., ¶ 10. Over two years later, on October 26, 2009, Regulation 4350—a statewide emergency regulation—was issued. *Id*., ¶ 11. *See Cal. Code of Reg.*, Title 9, § 4350. Codified in the California Code of Regulations, Regulation 4350 prohibits patients

at all of DSH's facilities from possessing devices with wired or wireless internet

connectivity capabilities. *Id*. It reads in relevant part:

> Contraband Electronic Devices with Communication and Internet Capabilities.
>
> Electronic devices with the capability to connect to a wired (for example, Ethernet, Plain Old Telephone Servce (POTS), Fiber Optic) and/or a wireless (for example, Bluetooth, Cellular, Wi-Fi [], WiMAX) communications network to send and/or receive information are prohibited, including devices without native capabilities that can be modified for network communication. . . . Some examples of prohibited devices include desktop computers, laptop computers, cellular phones, electronic gaming devices, personal digital assistant (PDA), graphing calculators, and radios (satellite, shortwave, CB and GPS).

9 CCR § 4350.

In February of 2010, DSH patients were notified of the anticipated implementation

of Regulation 4350 and were asked to store, mail, or dispose of any prohibited items in

order to become compliant. *Id*., ¶ 12. Some DSH-C patients who owned laptops prior to

the moratorium were allowed to continue to use their devices, pending the outcome of

this litigation. *Id*., ¶ 14. Of the approximately 920 patients at DSH-C committed under

the SVPA, there are approximately 60–70 patient-owned computers at DSH-C. *Id*., ¶ 15.

However, as will be discussed more below, DSH-C provides hospital-owned computers

and word processing equipment for patient use for legal work, treatment, and other needs.

*Id*., ¶ 19.

Even with the current moratorium on devices, at least 200 individuals at DSH-C

have been involved with the possession or transmission of child pornography. *Id*., ¶ 22.

And even with the present ban, and with the hospital IT department's preventative

measures to restrict internet access on patient-owned devices, there are nonetheless still typically 2–3 new child pornography cases reported each month involving Coalinga patients and which require investigation. *Id.*, ¶ 24. Sergeant Jerry DuVall is currently the only qualified examiner on staff in the DSH-C Department of Police Services who has the training and qualifications to conduct computer-crime investigations. *Id.*, ¶ 21. His investigations are necessarily time-intensive, as he must conduct forensic examinations of cell phones, memory cards, hard drives, and laptops. *Id.*, ¶ 27. In examinations with multiple devices, Sgt. DuVall's investigation may take months. *Id.*, ¶ 32. In addition to investigations involving child pornography, Sgt. DuVall also has investigations involving: aerial photographs of DSH-C; local maps; partially created identifications cards; photographs and videos of staff and other patients; recordings of conversations with staff and patients; access to websites where child profiles are sought; searches for staff information on social media sites; use of phone call anonymizers to block caller ID; emails and texts to arrange narcotics trafficking; coordination of other contraband into the hospital; and prohibited contact with children via video chat, voice chat, or phone calls. *Id.*, ¶ 33.

Plaintiffs have alleged that Regulation 4350 is unconstitutionally punitive in violation of the Fourteenth Amendment. This Court originally dismissed Plaintiffs' computer claims for failure to state a claim, but the Ninth Circuit reversed. It held that Plaintiffs "stated a plausible condition of confinement claim" but noted that "[i]t may well be that the defendants can provide reasonable justifications for Section 4350's ban

on the relevant devices." Dkt. 228, p. 40. Primarily before the Court is Defendants'

motion for summary judgment as to Plaintiffs DeBerry, Frazier, and Robinson, and their

motion for partial summary judgment as to Allen. In addition, the Court will resolve the

other pending motions, as discussed below.

## ANALYSIS

### 1.      Jackie Robinson's Motion to File an Amended Complaint (Dkt. 243)

Robinson has previously amended his complaint three times. *See* Dkts. 1, 6, 10,

and 35 in Case No. 1:08-cv-1339. His operative complaint is at Docket 35, titled Third

Amended Complaint in his now-closed member case (Case No. 1:08-cv-1339).

Defendants answered Robinson's Third Amended Complaint on September 12, 2014, at

docket number 196 in the lead case. Robinson now seeks to file a Fourth Amended

Complaint. His proposed Fourth Amended Complaint primarily expands on his existing

condition of confinement claim that DSH-C's computer policies are excessively

restrictive. But he also seeks to propound a new claim not currently before the Court: that

DSH-C has violated his First Amendment Rights "to communicate with others, to create

information and speech, [and] to receive [and] send information." Dkt. 244, p. 7. For the

reasons discussed below, the Court will deny Robinson's motion.

"The district court is given broad discretion in supervising the pretrial phase of

litigation, and its decisions regarding the preclusive effect of a pretrial order . . . will not

be disturbed unless they evidence a clear abuse of discretion." *Johnson v. Mammoth*

*Recreations, Inc*., 975 F.2d 604, 607 (9th Cir.1992) (citation and internal quotation marks

omitted). "Courts are free to grant a party leave to amend whenever 'justice so requires,' . . . and requests for leave are generally granted with 'extreme liberality.'" *Moss v. United States Secret Service*, 572 F.3d 962, 972 (9th Cir.2009) (citing *Owens v. Kaiser Foundation Health Plan, Inc.,* 244 F.3d 708, 712 (9th Cir.2001)).[1] However, liberality in granting a plaintiff leave to amend "is subject to the qualification that the amendment not cause undue prejudice to the defendant, is not sought in bad faith, and is not futile." *Thornton v. McClatchy Newspapers, Inc.*, 261 F.3d 789, 799 (9th Cir.2001) (citation omitted).

Here, the Court finds that Robinson's proposed amended complaint would cause undue prejudice to the Defendants and would be futile. With regard to his First Amendment claim, the Ninth Circuit affirmed this Court's dismissal of that claim and remanded only the substantive due process claim. Dkt. 188. As Defendants note,

---

[1] Conversely, when a motion to amend is filed after the deadline to amend in a court's scheduling order, the standard is different. In general, the pretrial scheduling order can only be modified "upon a showing of good cause." *Id*. at 608 (citing Fed. R. Civ. P. 16(b)). The pretrial schedule may be modified "if it cannot reasonably be met despite the diligence of the party seeking the extension." *Id.* at 609. If the party seeking the modification "was not diligent, the inquiry should end" and the motion to modify should not be granted. *Id.* On December 15, 2014, the Court entered a Scheduling Order governing the computer claims of Plaintiffs Allen, DeBerry, Robinson, and Frazier. *See* Dkt. 201. While that Scheduling Order did not provide a deadline to amend complaints, it did provide deadlines for the remainder of this litigation. Because the Scheduling Order could have been more specific, the Court will apply the more liberal amendment standard under Rule 15(a) versus the "good cause" standard under Rule 16(b). But regardless, Robinson has not met either standard.

Robinson may not now try to revive an already-dismissed claim by seeking to amend his complaint yet again.

With regard to the clarifications Robinson wishes to make to his existing condition of confinement claim, the Court finds that allowing this amendment would significantly prejudice the Defendants and would delay the resolution of this lawsuit. Defendants answered Robinson's Third Amended Complaint on September 12, 2014, at docket 196 in the lead case. Prior to that, Robinson had ample time to amend his complaint and did so successfully three times. Robinson has not pointed to any newly discovered information that would compel the Court to allow this amendment. Accordingly, the Court will deny Robinson's Motion to Amend (Dkt. 243).

### 2. Allen and DeBerry's Motion to Compel (Dkt. 217)

In their Motion to Compel, Plaintiffs Allen and DeBerry ask this Court to order Defendants to supply responses to their interrogatories and requests for production. Dkt. 217. Defendants served their answers to interrogatories and a response to the request for production of documents on or about the April 13, 2015 deadline. Defendants intended to supplement their responses, but before they did so, Plaintiffs filed the Motion to Compel on May 14, 2015. Dkt. 217. On May 27, 2015, Defendants served their supplemental response. Dkt. 220, p. 3. Within their supplemental response, Defendants produced documents responsive to 12 of the 25 requests, provided substantive answers to 18 of the 25 interrogatories, and also noted when there were no responsive documents in existence.

As Defendants explained in their response brief, Plaintiffs took issue only with the Defendants original responses, not their supplemental response and document production. Plaintiffs did not file a reply brief and therefore do not apparently object to Defendants' supplemental responses and document production. Accordingly, the Plaintiffs' Motion to Compel (Dkt. 17) will be denied as moot.

### 3. Robinson's Motion for Extension of Time and Request for Counsel (Dkt. 232)

Three days after the response deadline following Defendants' Motion for Summary Judgment had passed, Robinson untimely filed a motion for extension of time and request for counsel. Robinson requests counsel based on the complexity of this lawsuit and argues that without counsel, he will be unable to articulate his arguments.

Various plaintiffs involved in this litigation have requested counsel in the past. Most recently, the Court denied Plaintiff Vasquez's request for "amicus curiae or class counsel." Dkt. 170. Within that order, the Court noted that it "has made it clear in past orders that, even though Court staff are attempting to find new pro bono counsel for Plaintiffs, that may not be possible, and all pro se parties must continue representation of themselves pro se during the pendency of this case." Dkt. 170, p. 19. To the extent Robinson's current motion can be construed as a motion for reconsideration of the Court's previous orders regarding appointment of counsel, it must be denied.

Reconsideration of a court's prior ruling under Federal Rule of Civil Procedure 59(e) is appropriate "if (1) the district court is presented with newly discovered evidence, (2) the district court committed clear error or made an initial decision that was manifestly

unjust, or (3) there is an intervening change in controlling law." *S.E.C. v. Platforms Wireless Int'l Corp.,* 617 F.3d 1072, 1100 (9th Cir.2010) (citation omitted). If the motion to reconsider does not fall within one of these three categories, it must be denied.

Robinson has not met this standard. He has not pointed to any new factual information or any intervening change in the controlling law. Nor is the Court persuaded that it committed any error in denying requests for counsel earlier in this case.

While Robinson does not indicate that he is indigent, he should nonetheless be aware that the federal courts have no authority to require attorneys to represent indigent litigants in civil cases under 28 U.S.C. § 1915(e). *See Mallard v. U.S. Dist. Court for the Southern Dist. of Iowa,* 490 U.S. 396, 298 (1989). Rather, when a court "appoints" an attorney, it can only do so if the attorney voluntarily accepts the assignment. *Id.* The Court has no funds to pay for attorney fees in civil matters, such as this one.

Unlike criminal defendants, prisoners and indigents in civil actions have no constitutional right to counsel unless their physical liberty is at stake. *Lassiter v. Dept. of Social Services,* 452 U.S. 18, 25, 101 S.Ct. 2153, 68 L.Ed.2d 640 (1981). In civil cases, counsel should be appointed only in "extraordinary cases." *Id.* at 1330. To determine whether extraordinary circumstances exist, the court should evaluate two factors: (1) the likelihood of success on the merits of the case, and (2) the ability of the plaintiff to articulate his claims pro se in light of the complexity of legal issues involved. *Agyeman v. Corrections Corp. of America,* 390 F.3d 1101, 1103 (9th Cir.2004) (citation omitted).

Neither factor is dispositive, and both must be evaluated together. *Terrell v. Brewer,* 935 F.2d 1015, 1017 (9th Cir.1990).

Here, as will be discussed below, the likelihood of success on the merits of Robinson's computer claim is nonexistent. Moreover, Robinson has repeatedly demonstrated that he is more than capable of articulating his position. His lawsuit has been pending for eight years; at this point, Robinson has more experience in federal court than many attorneys. While this case presents something of a procedural quagmire, the complexity of Robinson's remaining claim is not particularly high. As such, the Court will deny Robinson's motion (Dkt. 232).

### 4. **Allen's Motion to Strike (Dkt. 229)**

Allen moves to strike the filing submitted by Defendants on July 10, 2015 at Docket No. 226. Dkt. 229. This filing was a request from defense counsel Jesse Rivera to file an over-length brief. Allen submits that Mr. Rivera has "never submitted any [c]orrespondence, pleadings and filings in regards to [his] claims" and that he has "always dealt with the California State Attorney General Office." In response, Defendants point out that Mr. Rivera has "been engaged as an active litigator for the defense in this consolidated matter since 2010, including appearing at the triage conference in this Court, and in the 9th Circuit arguments." Dkt. 231, p. 4. The Court will deny Allen's motion to strike (Dkt. 229) as it appears that there is no basis in fact or in law to hold otherwise. The Court will also grant Defendants' motion to file an over-length brief (Dkt. 226).

5. **Defendants' Motion for Summary Judgment (DeBerry, Frazier, Robinson Cases) and Partial Summary Judgment (Allen Case) (Dkt. 227, 228)[2]**

In 2012, this Court dismissed Plaintiffs' computer claims, finding that Plaintiffs had failed to state a claim upon which relief could be granted. Dkt. 102, p. 23. Plaintiffs appealed and the Ninth Circuit reversed, holding that Plaintiffs "alleged sufficient facts to plausibly claim that Section 4350 is punitive." *Allen v. Mayberg*, 577 F. App'x 728, 732 (9th Cir.2014). The Ninth Circuit noted, however, that "[i]t may well be that the defendants can provide reasonable justification for Section 4350's ban on relevant devices." *Id*.

A. *Legal Standards*

(1) **Summary Judgment**

Summary judgment is appropriate where a party can show that, as to any claim or defense, "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  One of the principal purposes of the summary judgment "is to isolate and dispose of factually unsupported claims . . . ." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986).  It is "not a disfavored procedural shortcut," but is instead the "principal tool[ ] by which factually insufficient claims or defenses [can] be isolated and prevented from going to trial with the attendant

---

[2] Defendants originally filed their motion for summary judgment at Docket No. 227, with an accompanying memorandum (Dkt. 227-1), statement of facts (Dkt. 227-2), and various declarations and attachments (Dkt. 227-3–227-9). Thereafter, they filed an amended memorandum in support of their motion for summary judgment (Dkt. 228). This was filed as an amended *motion* but in reality is simply an amended *memorandum*. Accordingly, the Court will consider Docket Nos. 227 and 228 together.

unwarranted consumption of public and private resources." *Id*. at 327.  "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986).  There must be a genuine dispute as to any material fact—a fact "that may affect the outcome of the case." *Id*. at 248.

The evidence must be viewed in the light most favorable to the non-moving party, and the Court must not make credibility findings.  *Id*. at 255.  Direct testimony of the non-movant must be believed, however implausible.  *Leslie v. Grupo ICA*, 198 F.3d 1152, 1159 (9th Cir.1999).  On the other hand, the Court is not required to adopt unreasonable inferences from circumstantial evidence.  *McLaughlin v. Liu*, 849 F.2d 1205, 1208 (9th Cir.1988).

The moving party bears the initial burden of demonstrating the absence of a genuine dispute as to material fact.  *Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir.2001)(en banc).  To carry this burden, the moving party need not introduce any affirmative evidence (such as affidavits or deposition excerpts) but may simply point out the absence of evidence to support the nonmoving party's case.  *Fairbank v. Wunderman Cato Johnson*, 212 F.3d 528, 532 (9th Cir.2000).

This shifts the burden to the non-moving party to produce evidence sufficient to support a jury verdict in her favor.  *Deveraux*, 263 F.3d at 1076.  The non-moving party must go beyond the pleadings and show "by her [ ] affidavits, or by the depositions,

answers to interrogatories, or admissions on file" that a genuine dispute of material fact exists. *Celotex*, 477 U.S. at 324.

However, the Court is "not required to comb through the record to find some reason to deny a motion for summary judgment." *Carmen v. San Francisco Unified Sch. Dist.*, 237 F.3d 1026, 1029 (9th Cir.2001) (quotation omitted).   Instead, the "party opposing summary judgment must direct [the Court's] attention to specific triable facts." *Southern California Gas Co. v. City of Santa Ana*, 336 F.3d 885, 889 (9th Cir.2003).

### (2) Conditions of Detention

To determine whether conditions of confinement of civilly committed individuals violate the constitution, courts look to the substantive due process clause of the Fourteenth Amendment. *Youngberg v. Romeo,* 457 U.S. 307, 321–22 (1982); *Jones v. Blanas,* 393 F.3d 918, 931–32 (9th Cir.2004). Civilly committed persons have a substantive due process right to be free from restrictions that amount to punishment. *United States v. Salerno,* 481 U.S. 739, 746–47 (1987); *Bell v. Wolfish,* 441 U.S. 520, 535 (1979). "There is no constitutional infringement, however, if restrictions are but an incident of some other legitimate government purpose." *Valdez v. Rosenbaum,* 302 F.3d 1039, 1045 (9th Cir.2002) (internal citations omitted).

In order to be permissible, restrictions must (1) have a legitimate, non-punitive purpose and (2) not appear excessive in relation to that purpose. *Bell,* 441 U.S. at 538–39. Due process requires that civil detainees' conditions of confinement bear some reasonable relationship to the purpose for which they are committed. *Seling v. Young,* 531

U.S. 250, 265 (2001). Examples of legitimate, non-punitive government interests include ensuring a detainee's presence at trial, maintaining jail security, and effective management of a detention facility. *Jones*, 393 F.3d at 932.

Finally, although civilly detained persons must be afforded more considerate treatment and conditions of confinement than criminals whose conditions of confinement are designed to punish, courts may rely on decisions defining the constitutional rights of prisoners, as they establish a floor for constitutional rights of persons detained under a civil commitment scheme. *Padilla v. Yoo*, 678 F.3d 748, 759 (9th Cir.2012) (citations omitted).

### B. There is no Constitutionally protected right to possess and use personal laptops and electronic devices

A Sexually Violent Predator (SVP) is statutorily defined as an individual with "a diagnosed mental disorder that makes the person a danger to the health and safety of others in that it is likely that he or she will engage in sexually violent criminal behavior." CAL. WELF. & INST. CODE § 6600(a)(1). SVPs are not prisoners, but the SVPA is designed to protect society from—and provide treatment for—SVPs who would endanger others upon release. "The law generally requires a careful balancing of the rights of individuals who are detained for treatment, not punishment, against the state's interests in institutional security and the safety of those housed at the facility." *Hydrick v. Hunter*, 500 F.3d 978, 990 (9th Cir. 2007), *vacated on other grounds by Hunter v. Hydrick*, 556 U.S. 1256 (2009) (citing *Youngberg v. Romeo*, 457 U.S. 307, 319–322 (1982)). It is important to keep in mind that "SVPs have been civilly committed subsequent to criminal

convictions and have been adjudged to pose a danger to the health and safety of others. Therefore, the rights of SVPs may not necessarily be coextensive with those of other civilly detained persons." *Id.*

To this Court's knowledge, no court has ever held that a civil detainee such as an SVP has a constitutionally protected right to possess and use personal laptops and other similar electronic devices. *See Telucci v. Withrow*, 2016 WL 2930629 at *5 (E.D. Cal May 19, 2016 (unpub.) (listing the following cases for the same proposition: *see Endsley v. Luna*, 2008 WL 3890382 at *3 (C.D.Cal. May 23, 2008) (unpub.) (*citing Sands v. Lewis*, 886 F.2d 1166, 1172 (9th Cir.1989)) (prisoners do not have a constitutional right to have memory typewriters in cells), *overruled on other grounds by Lewis v. Casey*, 518 U.S. 343, 350-55 (1996); *Taylor v. Coughlin*, 29 F.3d 39, 40 (2nd Cir.1994) ("If prison inmates do not enjoy a constitutional right to typewriters as implements of access to the courts, it would be illogical for us to rule that there is a constitutional right to typewriters of a specific memory capacity."); *State ex rel. Anstey v. Davis*, 203 W.Va. 538, 545, 509 S.E.2d 579 (1998) ("We are persuaded by the uniformity of opinion on this issue and therefore hold that prison inmates have no constitutional right to possess personal computers in their cells."); *Endsley v. Luna*, 2009 WL 3806266 (C.D.Cal. Nov.12, 2009) (unpub.) at *16 (*citing Fogle v. Blake*, 227 Fed. Appx. 542, 542 (8th Cir.2007)) (finding civil committee failed to state a constitutional claim regarding denial of a computer or typewriter); *Spicer v. Richards*, 2008 WL 3540182 at *7 (W.D.Wash. Aug.11, 2008) (unpub.) (finding no authority to show that SVP had a 14th Amendment right to possess a

"cell phone, pager, computer, [or] color ink cartridge printer."); *Carmony v. County of Sacramento*, 2008 WL 435343 at *18 (E.D.Cal. Feb.14, 2008) (finding civil detainee had no "free-standing First Amendment right to access computers and/or the internet."); *White v. Monahan*, 2009 WL 499121 at *2 (C.D. Ill. Feb 24, 2009) (acknowledging that while civil detainees enjoy more liberties than convicted prisoners, "[t]he inability to possess a computer does not implicate a property interest that might be protected by procedural due process protections or an interest that might be classified as a substantive due process interest.")).

Because Plaintiffs cannot demonstrate that they have a constitutionally protected property interest in owning their own electronic devices, any claim that Defendants violated their procedural due process rights must fail as a matter of law. *See Valdez v. Rosenbaum*, 302 F.3d 1039, 1045 (9th Cir.2002) ("Valdez did not have a state-created liberty interest in using a telephone during his pretrial confinement. Accordingly, his procedural due process claims fail.") Without addressing whether Plaintiffs have a constitutional right to possess laptops and other related electronic devices, the Ninth Circuit found that Plaintiffs stated "a plausible condition of confinement claim . . . that Section 4350 is punitive." Accordingly, the Court will next analyze whether Regulation 4350 amounts to a denial of substantive due process because it constitutes punishment. The Court concludes that it does not.

### C. Regulation 4350 does not violate the 14th Amendment.

Again, Regulation 4350 prohibits patients from possessing any electronic devices with wireless capabilities, as well as electronics with audio or video recording capabilities. Within their various complaints, Plaintiffs have alleged generally that Regulation 4350 is excessively punitive in light of the Defendants' non-punitive purpose in enacting it, and that the same non-punitive purpose could be accomplished via less restrictive alternatives.[3]

Under the Fourteenth Amendment, "punitive conditions may be shown (1) where the challenged restrictions are expressly intended to punish, or (2) where the challenged restrictions serve an alternative, non-punitive purpose but are nonetheless excessive in relation to the alternative purpose, or are employed to achieve objectives that could be accomplished in so many alternative and less harsh methods." *Jones v. Blanas*, 393 F.3d 918, 932 (9th Cir.2004) (citations omitted).  "Legitimate, non-punitive government

---

[3] Plaintiffs Allen and DeBerry request this Court take judicial notice of eleven separate documents that they have submitted in opposition to Defendants' motion for summary judgment. (Dkt. 237). They have not cited any authority for this request, and the Defendants have not opposed it.

Federal Rule of Evidence 201 authorizes a court to take judicial notice of "adjudicative facts," but not entire documents. Plaintiffs have alleged that these eleven documents are "true copies of the original copies" and therefore may be asking the Court to find that these documents are "self-authenticating" under Federal Rule of Evidence 901. What is clear to the Court is that Plaintiffs wish for these documents to be considered as part of their response to Defendants' motion for summary judgment. As Defendants have not opposed Plaintiffs' request, the Court will construe the same liberally and will grant Plaintiffs' motion for judicial notice insofar as the Court will consider the eleven documents as part of Plaintiffs' opposition to Defendants' motion for summary judgment.

interests include ensuring a detainee's presence at trial, maintaining jail security, and effective management of a detention facility." *Id.*

**(1)      There is no evidence that Regulation 4350 was expressly intended to punish patients at DSH-C.**

Defendants have submitted uncontroverted evidence that Regulation 4350 was adopted for legitimate, non-punitive purposes. The reasonable justifications for Regulation 4350's ban on electronic devices are many, but DSH-C's primary interest in implementing the ban is to ensure the safety and security of staff and patients.

Prior to the promulgation of Regulation 4350, patients were permitted to own and possess their own laptop computers through a test program provided by AD 654. AD 654 allowed patients to own their own computers, but prohibited devices or equipment that allowed patients to have private communications with others, and also prohibited electronic images that depicted overt sexual acts or violence with adults and children. *UMF*, ¶ 6. However, during this time that AD 654 was in place, numerous safety and security violations were found at DSH-C including: (1) patients' widespread distribution of pornographic material, including child pornography; (2) audio recordings of staff and patient conversations within the hospital; (3) widespread distribution and sharing of data encryption and concealing software; and (4) computerized street map and atlas software.

*UMF*, ¶ 8.[4] Eventually, DSH-C conducted a risk assessment analysis and concluded that patients' use of their existing personal devices under AD 654 put the facility at risk of patients gaining internet access. *Id.*, ¶ 9. It was no surprise, then, when DSH-C issued a moratorium on personal devices only seven months after AD 654 was implemented. *Id.*, ¶ 10.

On October 26, 2009, two years and eight months after the moratorium was implemented, Regulation 4350 was issued statewide. *Id.*, ¶ 11. In February of 2010, DSH patients were notified of the procedures that Regulation 4350 would require and were asked to store, mail, or dispose of the now-illicit devices in order to become compliant. *Id.*, ¶ 12.

Despite the moratorium on patient-owned devices, safety and security problems still repeatedly arise. *Id.*, ¶ 16. In fact, Sgt. DuVall's declaration indicates that even with the current moratorium on patient-owned devices, "at least 200 individuals at DSH-C have been involved with the possession or transmission of child pornography." *DuVall Decl.*, ¶ 5. Plaintiffs do not dispute that some patients have been found possessing thousands of images and videos of child pornography, with children as young as infants depicted. *Id.* And, even with the present ban in place and despite DSH-C's preventative

---

[4] Allen and DeBerry do not dispute this fact but they do allege that the ability to engage in these prohibited activities was facilitated by DSH-C staff who introduced illegal devices to the patient population. *UMF*, ¶ 8. Assuming this is true, it does not change the Court's analysis, or have any bearing on the ultimate issue: whether Regulation 4350 is punitive.

measures, "there are typically 2–3 new child pornography cases reported each month . . .
at Coalinga[,] which require investigation." *Id.*, ¶ 10. Indeed, Sgt. DuVall has
investigated cases where patients have solicited child pornography via text messages,
internet searches, and downloads from torrent sites or peer to peer file sharing. *Id.*, ¶ 6.

     The financial costs associated with investigating child pornography cases are
substantial. These investigations require "labor-intensive forensic examinations of cell
phones, memory cards, hard drives or laptops to detect child pornography." *DuVall Decl.*,
¶ 7. DSH-C Police Services use semi-automated software to aid in their searches, but the
content must still be reviewed by an examiner because the software cannot detect
document files or links, web history, or text-based documents. *Id.* Plaintiffs do not
dispute that examining devices such as memory cards, hard drives, and cell phones
requires specialized—and costly—equipment. *Id.* It is also undisputed that police
examinations in instances "where multiple devices are involved can take months to
complete, further taxing already overburdened resources." *Id.*, ¶ 8.

     Crucially, even when DSH-C staff takes preventative measures to remove the
WiFi cards and plug the Ethernet ports on patients' laptops, those precautions are easily
defeated when a contraband cell phone is used to tether internet connection to a laptop or
other device. *UMF*, ¶ 35. According to Sgt. DuVall, at least 100 cell phones have been
confiscated at Coalinga. *Id.*, ¶ 36. Cell phones are also used to coordinate the introduction
of contraband from outside sources. *Id.*, ¶. DSH-C patients are permitted to move freely

about the facility and socialize with one another, which makes it easier to conceal and share memory cards and contraband images. *Id.*, ¶¶ 39–40.

In addition to child pornography violations, the unauthorized use of patient-owned devices has resulted in a wide array of threats to security of staff. Even with the present ban, Sgt. DuVall has investigations involving the following: (1) aerial photographs of DSH-C; (2) local maps; (3) partially created identification cards; (4) photographs and videos of staff and other patients from inside the hospital; (5) secret recordings of conversations between staff and patients; (6) social websites where child profiles have been sought out; (7) Facebook searchers of staff; (8) use of cell phone anonymizers to block caller ID; (9) emails and texts to outside persons to arrange narcotics and other contraband deliver; (10) harassing phone calls to members of the public; and (11) prohibited contact with children via video chat, voice chat, or phone calls. *Id.*, ¶ 11.

In addition, DSH-C is currently installing a new wireless security system in its facilities, known as the Personal Duress Alarm (PDA) system. *UMF*, ¶ 84. This system is being installed in response to staff security threats, and will allow the facility to individually track staff locations. *Id.*, ¶ 87. But the installation of the PDA also opens DSH-C up to the potential for a different type of security breach. *Id.*, ¶ 90. Installation of the PDA necessitates thousands of wireless access points in the facility. *Id.*, ¶ 86. The Deputy Director of Information Technology for DSH, Jamie Mangrum, indicates in his declaration that "[a] very real and serious danger to staff could occur if an unauthorized person, such as an SVP patient, used a device to breach and gain access to the PDA."

*Mangrum Decl.*, ¶ 5. DSH-C is also planning to install a wireless prescription ordering and dispensing system to modernize the current methods used by staff. *Id.*, ¶ 7. But because it is a wireless system, it is vulnerable to a security breach. *Id.* If unauthorized access is gained to the planned prescription system, drugs or dosages may be manipulated, which could be life-threatening to patients. *Id.*

In sum, there is no evidence in the record that the adoption of Regulation 4350 was expressly intended to punish DSH-C patients. Rather, the reasons for implementing the ban are numerous and well-founded. To allow patients to possess their own electronic devices would necessarily increase the already alarming number of violations that occur at DSH-C. Even with the ban in place, the child pornography violations are pervasive and well-documented; even Plaintiffs admit there is a "porn epidemic" at DSH-C. Dkt. 233, p. 11. Moreover, the cost to DSH-C in terms of hiring technology staff and conducting investigations would be prohibitive. The logistics and expense involved in taking preventative measures with over 1100 patients who may have multiple devices, monitoring those devices to ensure that wireless capabilities have not been reactivated, and conducting time-intensive investigations when violations do occur is simply not feasible given the hospital's already overburdened staff and budget. In short, to lift the ban on devices would jeopardize the safety of patients and staff, lead to the re-victimization of child pornography victims, and halt the progress of patients' treatment.

       (2)         **Regulation 4350 is not excessive in relation to its non-punitive purposes; nor could those same non-punitive purposes be accomplished with less harsh methods.**

In next addressing whether punitive intent can be inferred from the nature of the restriction, courts ask whether the restriction is reasonably related to a legitimate governmental objective. If it is, then the restriction does not amount to punishment. *Valdez*, 302 F.3d 1039, 1045–46.

Looking first to the governmental interests in restricting patients' ownership and possession of electronic devices, the Court concludes that DSH-C has a legitimate interest in ensuring the safety of its staff, other patients, and the public. *Bell*, 441 U.S. at 566 ("maintaining institutional security and preserving internal order and discipline are essential goals that may require limitation or retraction of the retained constitutional rights of [. . .] pretrial detainees."). Additionally, there is a legitimate governmental interest in the government's efficient allocation of resources and staff. *See Beard v. Banks*, 548 U.S. 521, 529 (2006); *Lewis v. Phillips*, 2014 U.S. Dist. LEXIS 42586, at *16 (C.D. Ill., Mar. 28, 2014) (unpublished). The record in this case makes clear that Regulation 4350 was imposed to further these interests for all the reasons already discussed above.

Turning next to consider whether Regulation 4350 is reasonably related to these legitimate interests, the Court must conclude that there has been no "exaggerated response" here. A reasonable relationship between the governmental interest and the challenged restriction does not require an "exact fit," [] nor does it require showing a "least restrictive alternative." *Valdez*, 302 F.3d at 1046 (citations omitted). Defendants explain that Regulation 4350 is designed not only to restrict potential internet access, but

also to combat the patients' ability to discretely store and share inappropriate material and to record staff and patient conversations. *UMF*, ¶¶ 8–10, 13, 16, 23–26, 31, 34–35. While cell phones and laptops are the most obvious electronic threats, other devices have varying abilities to connect to the internet. And with ever-advancing technological developments, it is not feasible for Defendants to list every internet-capable device by name. *Id.*, ¶¶ 97–101.

It is important to note that while restricting patient-owned devices, DSH-C provides safer, comparable substitutes for its patients through hospital-owed devices. DSH-C provides computers and word processing equipment for patients to do legal research, legal work, and to work on treatment-related assignments. *UMF*, ¶ 19.[5] Allen admits that legal research can be done on the hospital-provided computers in the library. *UMF*, ¶ 44. On certain nights, the hospital has game nights where patients can play bingo and card games, but not electronic games. *Id.*, ¶ 48. That DSH-C provides comparable, safer alternatives to patients further underscores that Regulation 4350 is not punitive and that there has been no exaggerated response to DSH-C's legitimate concerns.

Finally, the same non-punitive purposes of safety and security could not be accomplished with less harsh methods. Indeed, DSH-C has tried to use less restrictive

---

[5] As to this statement of fact and several others, Allen and DeBerry dispute this by saying "[n]o, [s]ee Plaintiffs' Opposition to Defendants' MSJ." This response does not create a genuine issue of material fact, as Plaintiffs have not supported their blanket denials with any admissible evidence. Statements in a brief are not evidence and cannot be used to create an issue of fact. *Barnes v. Independent Auto Dealers*, 64 F.3d 1389, 1396 n. 3 (9th Cir.1995).

means and the results were (1) a strain on limited resources; (2) an increase in patient policy violations; and (3) a decrease in overall hospital security. While AD 654 was in effect, DSH-C staff attempted to monitor approved devices owned by hundreds of patients, but privileges were abused and policy violations were made. If Regulation 4350 is lifted, additional financial hospital resources and staff will be needed to acquire and maintain software capable of effectively searching electronic devices and files for indicia of unlawful activity such as child pornography. *UMF*, ¶ 17. Additionally, DSH-C would need to hire additional specially trained IT staff and law enforcement to conduct electronics searches and criminal investigations, which would in turn divert from already-limited mental health resources. *Id.*, ¶ 18.

Plaintiffs have not put forth any evidence that Regulation 4350 is excessive in relation to its legitimate, non-punitive government purposes of maintaining staff and patient safety, as well as effectively managing the hospital and its limited resources. Defendants' motion for summary judgment as to DeBerry, Frazier, and Robinson is granted, as is Defendants' motion for partial summary judgment as against Allen.

## ORDER

**IT IS ORDERED:**

1.     Robinson's Motion for Request for Leave to File First Amended Complaint (Dkt. 243) is **DENIED**.

2.     Plaintiffs' Motion to Compel (Dkt. 217) is **DENIED AS MOOT**.

3.     Defendants' Motion for Leave to File Over-Length Brief (Dkt. 226) is

**GRANTED**.

4.     Robinson's Motion for Extension and Appointment of Counsel (Dkt. 232)

is **DENIED**.

5.     Allen's Motion to Strike Attorney Filing (Dkt. 229) is **DENIED**.

6.     Defendants' Motion for Summary Judgment (Dkt. 227, 228) is

**GRANTED**.

7.     Separate judgments shall issue in accordance with Federal Rule of Civil

Procedure 54.

DATED: August 16, 2016

B. Lynn Winmill
Chief Judge
United States District Court